### HILARIO VALDEZ *et al.* v. STATE.

No. A-3590—Opinion Filed Jan. 10, 1921.

(194 Pac. 451.)

(Syllabus.)

1.  **APPEAL AND ERROR—Verdict on Conflicting Evidence.** The jury is the exclusive judge of the evidence, and, where there is evidence reasonably sustaining the verdict, this court will not disturb such verdict, notwithstanding the evidence is in conflict.

2.  **HOMICIDE—Murder—Liability of Co-conspirators.** Where two or more persons combine together for the purpose of accomplishing some unlawful act, and in the commission of such act murder is perpetrated, each of the parties to such conspiracy is guilty, regardless of whether he participated in the actual killing or not.

3.  **SAME—Conviction—Sufficiency of Evidence.** The evidence in this case carefully examined and considered, and found sufficient to support the verdict.

*Appeal from District Court, Pittsburg County;*

*R. W. Higgins, Judge.*

Hilario Valdez, *alias* John Lee, and Peter Crus were convicted of murder, and they appeal. Affirmed.

*Sewell & Eylar,* for plaintiffs in error.

*S. P. Freeling,* Atty. Gen., and *W. C. Hall,* Asst. Atty. Gen., for the State.

ARMSTRONG, J. The plaintiffs in error, Hilario Valdez, alias John Lee, and Peter Crus, hereinafter called defendants, were jointly informed against with Charles Wheeler for the murder of Crecencio Salinez. Upon being arraigned the defendant Charles Wheeler asked for and was granted a severance, and the said defendants Hilario Valdez and Peter Crus were tried jointly, each convicted, and sentenced to the penitentiary at McAlester for life. To reverse the judgment rendered they prosecute this joint appeal. This appeal is submitted for decision upon the record; no briefs having been filed.

The undisputed material evidence is that there was a cement plant about 1½ miles from Hartshorn, Okla., having a row of houses in close proximity, in which the employes of the plant lived, and in one of which houses resided a Mexican, one Romulo Savalla, who was known to act as banker for some of his countrymen; that at the time of the homicide he had, as such banker, in his keeping about $930, which was on the night of the homicide here charged kept in a locked box in a room in which was a trunk and in which trunk the money had been previously kept. On the night of the homicide and

previous to the attempted robbery there was in the trunk, among other things, a pair of tan buttoned shoes and a knife. Between 12 and 1 o'clock on the night of the homicide Savalla and his wife, sleeping in the same room, were awakened by a noise, and shortly thereafter two persons came into the room, one of them, a negro, having in his hands a stick with which he struck the wife, and the other, a Mexican, having a handkerchief over the lower part of his face, and just outside of the house was another person. Savalla and his wife ran from the house, calling for help, and in response to their call several of their countrymen living in adjacent houses, including Crecencio Salinez, came. Savalla fled toward the plant for a short distance and returned and engaged in an encounter with one of the persons who had been in the house. Shortly after the call for help was made shots were heard near the house of Savalla, and the body of Crecencio Salinez was found. Investigation disclosed the fact he had come to his death from gunshot and knife wounds. Near the body was found a hat that was identified at the trial as belonging to Peter Crus. When Savalla returned to his house he found that the trunk had been rifled and its contents scattered over the floor and on the bed. It was afterwards discovered that the tan buttoned shoes and the knife that had been in the trunk were missing. Shortly after the homicide was committed officers were called from Hartshorn and came on foot to the scene of the homicide, arriving there about 2 a. m., and after making an examination and viewing the body of deceased, returned to Hartshorn. About an hour later they met a negro, who afterwards proved to be Charles Wheeler, who was detained and searched and found with a pair of tan buttoned shoes, one in each

of his hip pockets and a knife and a piece of sandpaper, which sandpaper was wrapped in a piece of paper bearing the label of "Mitchell Bros. Huntington, Ark." The shoes and knife were taken from him. The negro was taken to the city jail, and the following evening released. At the time of the arrest and search of said negro it was not known to the officers that the shoes and knife found in his possession had been kept in the Savalla trunk. The negro when questioned by the officers, said he was from Huntington, Ark., and had arrived at Hartshorn that night, traveling on "the blind baggage," and stated that he bought the shoes about an hour before his arrest from a fellow that he did not know, and had paid $2.50 for them. The shoes did not fit him, and he said that he had bought them to help his stepson who lived in Arkansas. The shoes and knife were introduced in evidence and positively identified as the shoes and knife that were in the Savalla trunk which was rifled the night of the homicide.

A short time previous to the homicide Hilario Valdez had come to the Savalla house soliciting contributions for the burial of a Mexican child who had died from influenza. Savalla and his wife were at home and contributed, the wife going to the trunk in an adjoining room, in which room she was visible to Valdez, and from the trunk procured a $20 bill. Peter Crus, one of the defendants, was known as "Shorty." About the time of the commission of the homicide one of the robbers was heard to say, "Come on, Shorty." Some one who knew Peter Crus, commonly called "Shorty," recognized his (Crus') voice when he replied, "Do you want to die?" The two defendants now in court were shown to be about the size,

build, and general appearance of the two alleged robbers.

The mother-in-law of Savalla was sleeping in the same room with Savalla and his wife when the two robbers came, and testified that one of them went to her bedside and asked where the money was, and she told him that she knew nothing about the money, and he asked her where she had the money; that when the two men came into the room one of them had a stick with which he struck Mrs. Savalla on the arm before the latter ran from the house; that one of the said men was a negro and the other a Mexican.

Hilario Diaz, brother of Mrs. Savalla, lived in the house adjoining that of his sister, and was awakened by his sister's call for help, and started in the direction, and saw two men, one of whom had a knife and one of whom had a pistol, and he heard the short fellow say, "Do you want to die?" That the short fellow was the one who had the knife and cut him with it; that at the time he had something over his face from the nose down; and that his brother-in-law, Savalla, came to his assistance and hit his assailant with a piece of iron pipe.

It appears that Felix Flowers had been working at the cement plant and lived in one of the houses near by; he knew Hilario Valdez, sometimes called John Lee; that he had known him for more than a year; that he had known Peter Crus for a year or more, and both of them had worked at the cement plant and while working there they had boarded together; that he had heard Peter Crus talk at the plant; that Peter and Hilario ran a train together; that Hilario Valdez told him (Flowers) about two weeks after he took up the collection that he thought there

was some money in Savalla's house; that he thought he saw some when he took up the collection. Soon afterwards Crus left the camp, but came back there and was hanging around over Sunday and for two or three days before the killing. These two or three days he was with Hilario Diaz. This witness also testified that he recognized Crus and identified him fully as being one of the robbers and murderers.

At the time of the robbery and murder J. M. Ledbetter was night policeman at Hartshorn. He testified that he met the westbound passenger train from Arkansas that night; that it was part of his duty to meet this train and that nobody got off the train that night; that two men got on; that he noticed the blind baggage; that he got a call from the cement plant between 1 and 1:30 o'clock and went down there with other officers and found a dead man there; that the body was lying not far from the little porch of the house where the robbery had taken place, and that he and the other officers returned, and when they arrived in Hartshorn they met a negro who was perspiring freely; that they took from him the tan buttoned shoes which were exhibited and by other witnesses shown to belong to Savalla and to have been in the trunk on the night of the robbery and murder; that when he went to the cement plant he found a hat near the dead man; and that the hat exhibited is the same hat; the negro said that he had been lost and wandering around the country; that he and other officers did not say anything about the knife, but took it away from the negro, because it was a bad-looking knife; that the negro at the time of his arrest had on blue overalls, a coat, and tan shoes, and that the cement plant was about a mile and a half from Hartshorn, and required

about 45 minutes to walk it; that the next night after the homicide he went to Wilburton and got Peter Crus; that Peter Crus had his arm bound up.

Other witnesses testified that the robber answering to the description of Crus had been wounded in the arm during the fight and robbery. Mary Ingold testified that she lived with her father two miles south of Hartshorn; that her home is about a half mile from the cement plant; she knew Hilario Valdez, alias John Lee, before the day of the homicide; that she did not know Peter Crus until the day of the homicide; that when at the cement plant she saw him pass one of the houses; that she was planning to marry, got her suit case from home, and walked to Hartshorn with Sacramento and a stranger who talked the Mexican language, went to the post office, and there saw the defendants, who asked her to go with them, and she and defendants went to the Rock Island depot at about 6:15, and that in going to the depot John Lee took hold of her arm, and when he did so she felt a gun on his hip and asked him what he was carrying the gun for, and he said, "to play with; that it was a 38 Colt's, and that he might have to use it;" that she left her suit case at the depot, and she and defendants went to Haileyville, ate supper, and went back to Hartshorn and stayed two or three hours at an Italian's named Joe, and returned to the depot accompanied by the defendants, found the suit case gone and a negro in the depot, and John Lee asked him about her suit case, and he said he left a white man there when he went to get some coal, and when he returned the white man and the suit case were gone; that Peter Crus spoke to the negro as if he knew him, asking him where he

had been, and he said to Huntington, and that he had been up here a few days, and that he was not doing anything and was going back to Huntington; that the negro was about 5 feet 10 inches and tolerably heavy, weighed about 150 to 160 pounds, had on blue overalls and tan laced shoes, had a short mustache and was about 35 or 40 years of age; that she left the depot about 10 minutes to 12; that Peter Crus walked over as far as the city hall, when she left him and went through Hartshorn to Haileyville; that she left John Lee and the negro at the depot; that she was at the preliminary in this case, and saw Peter Crus there having on the same green hat that he had on at the depot the night the deceased was killed; that she had known John Lee about a year and three months; that she knew Peter Crus by sight when he worked at the cement plant, but did not know his name; that she was arrested on account of said homicide, confined in jail 5 days, and discharged.

J. T. Crenshaw testified that defendants were arrested at his hotel the next day after the killing; they came in the morning of the 12th at 4 o'clock and went to bed; that when he came in there was just a light burning on the porch, and that the entrance he came in was dark; that he asked who it was, and he said, "Pete;" that he got his breakfast the next morning, and did not see him later until the afternoon of the arrest; that the eastbound Rock Island train came in at 3:25; that it was after that train had passed that he came to his hotel, just a few minutes to 4 when he came; that he saw John Lee during the day; that he met some train and met a woman who came in on the east-bound Rock Island; that it must have been on Tuesday prior

to Wednesday the 11th of December that Peter Crus went away; that Peter Crus introduced him to the other defendant as his brother.

W. B. Stubbs, an officer, testified for the defendants that he had known the two defendants since they were in jail; saw them the day after they were brought to the jail; that Peter Crus did not have any wound on his forehead or face when he saw him; that he was injured in the jail, and a doctor was called to dress the wound a day or so after he was in the jail.

Peter Crus testified that he was born in Mexico; been in this country about 8 years; that during the time he had been in several places, Texas, New Mexico, Oklahoma, and Kansas, and that he does every kind of work and works in the mines; that he last worked in the mine at Wilburton; worked there about 4½ years; that he was boarding at the Crenshaw Hotel; that he got hurt the same day he was arrested; that he came out of the mines about 12 o'clock, came to the hotel, went to a drug store and put on some plaster; he said he never told Mr. Crenshaw at the time that he got hurt in the mine; that he was hurt in the left hand; that he was hit by something in the mines, he could not tell what they call it; it was the 11th day of December; that on the 11th day of December he had been working in the mines, and the day before was in McAlester; that he was at Hartshorn on the 9th; that he went down to tell Hilario "if you want to work in the mines"; that he saw Hilario at his house at the cement plant, went to Hartshorn, returned, and lay down in Hilario's house; that he did not see Mary Clubb at Hartshorn that night; that he saw her on the day of the 10th when he came

back from Wilburton; that he went back to Wilburton the day of the 10th on train 41 about 2 o'clock in the morning; that a bunk in the jail fell on him and hit his head; that before he was hit by the bunk he did not have any fresh sores on his head; that the night he went to Wilburton he saw Mary Ingold; that he had seen her in the post office, and this fellow Valdez talked to him because he wanted to talk to Mary Ingold; that he went to the depot the last time when he came back from Haileyville with Mary Ingold; that he did not go out to the cement plant or up to those houses where the Mexicans lived that night and commit a robbery or kill a man or have anything to do with it; that he stayed at the depot and went to sleep in the depot; that he bought the green hat he was wearing at Huntington; that when he was arrested he had on a white hat, but the green hat is the one he had on at the preliminary at Hartshorn; that the night Valdez and Mary went to the depot he had on a white hat; that the negro at the depot did not have on a brown hat, but a cap; here was exhibited to witness the brown hat that was in evidence and he was directed to put it on, but he refused, saying "it did not belong to him and he did not want to wear it"; that he refused the second time to try the hat on before the jury; that the hat had on the band "Myers Store, Huntington, Ark."; that he got hurt in the mine while he was shoveling coal, "and one thing and another when he shoveled coal and coal came loose and hit him"; that when he went to the hotel in Wilburton at 4 o'clock he went to bed, and got up at 5:30; that he understands "some words in English, but some not"; that he never spoke to Mary in English, because he could not speak good; that he did not talk to Bill Masters in English;

that he had never seen the brown hat offered in evidence before and did not know to whom it belonged; that the brown hat was not the hat he wore in the mines at Wilburton; it was a white hat; that he had two hats; that he used the white hat when he was working; that the night at Hartshorn he had on a green hat; that when he got down to the mine he left his white hat in the washroom and put on a cap; that Mr. Crenshaw had seen the white hat many times.

Hilario Valdez testified that he was a Mexican, born in Mexico; been in this country about 25 years; on the 10th day of December he and Peter Crus about 4 o'clock went to Hartshorn, and there saw a girl named Mary Ingold, talked with her, and went with her to the depot; that on the way to the depot he did not take Mary Ingold by the arm any time; that he did not have a gun; that he went to the depot and Mary left her suit case and promised to come to Wilburton; that while they were at the depot Peter Crus came, and he and Mary and Pete went to Haileyville together and returned with her to Hartshorn, and when they came back to the depot it was about 12 o'clock or a little after; that they saw a negro there; that he was a little tall man, and had a coat and he thinks blue overalls; that he had seen Charles Wheeler, his codefendant, at the jail; that he did not think he was the negro he saw at the depot that night; that he never talked to him; that he never asked about the girl's grip; she asked him herself; the negro never stayed more than five minutes; he left after Mary Ingold left; that she left the depot first, and Peter went off with her, and was gone about 20 minutes and came back, and when he came back the ne-

gro was gone and he and Peter stayed around the depot
until the train came; lay down there and waited for
the train to Wilburton; that the train came through about
2:30, and they went to Wilburton on it, stayed at the
depot, and then went to the Crenshaw Hotel and went
to bed; that Pete got up the next morning and he stayed
in bed; that he got up about 7 o'clock and met Pete
on the street close to the post office about 3 o'clock; that
Pete did not have his hand wrapped up; that he had
never seen the negro at the depot at any time before
that night; that he did not know him; never went off
with him anywhere that night; that he did not go to
the cement plant with anybody or rob that house or
have anything to do with the killing of the dead man
over there; that he did not know who killed him; that
the first he knew about it was when he got arrested;.
that Pete had on a green hat; that he had had a black
hat, the same he has now, and had that hat on the night
of the homicide; that he did not know Charley Wheeler
before he was brought to jail; that he worked at Hart-
shorn, and when there he and Pete boarded together and
ran a tramway, and Pete was his "buddy"; that he
worked in the mines in Mexico digging coal and did
every kind of work; that Pete told him he had a job
for him digging coal for the company, but does not
remember that he said anything about having a job
pumping; that he knows how to run a pump; that he
had run a pump; that a woman came in on the train
to Wilburton about 10 o'clock; Pete was not there with
him; that he and Pete and the woman did not go back
to the hotel together; that he went to the hotel with
the woman, but Pete was not with him; that he was not
very restless walking all around the next morning; that

he did not meet the west-bound train to Hartshorn the night before, and did not leave Mary and Pete at the depot to go and meet his wife; that he and the woman walked around and went to the company store; that Pete was there with him in the hotel when he was arrested.

J. T. Crenshaw, in rebuttal, testified that Peter Crus began boarding with him in August and continued until he was arrested; that the brown hat offered in evidence was similar to the one worn by Peter Crus when he went to work; that he had never seen him with a white Stetson hat, and had never seen the brown hat after his return from Hartshorn; that it was his recollection that when Hilario Valdez and the woman came to the hotel the day after the homicide Peter Crus came with them; that when he went off other than to work that he generally wore a green hat.

J. H. Smith, prison physician, testified that he was called to the jail to dress the head of a Mexican, which was a fresh injury; that he found only one wound; that he believed it was bleeding when he was called; that some statement was made that a bunk had fallen, but he did not know of his own knowledge that one of the bunks had fallen.

Upon the coming in of the verdict the defendant and each of them moved for a new trial, which motion was overruled, and defendants and each of them excepted.

The errors assigned in the petition in error are in effect one "that the verdict of the jury is not sufficiently supported by legal evidence."

We have most carefully read not only the voluminous

evidence in this case, but also the extended evidence in the case of Charles Wheeler, who was jointly informed against with the defendants for the murder of Crecencio Salinez, but tried separately and convicted, and find that the witnesses and the evidence on the part of the state in each of said cases are practically the same and have given all the facts described our careful consideration.

The evidence is positive as to the *corpus delicti*, the murder charged, but to a large extent circumstantial in connecting the defendants with the commission of the crime, but the "strands" of such circumstantial evidence are so connected, interwoven, and complete that they form a "cable" so strong that it cannot be broken by an inference of innocence of either of the defendants, but, on the contrary, directly points to their guilt beyond a reasonable doubt.

"In cases depending upon circumstantial evidence, where the circumstances proven are not only consistent with the guilt of the defendant, but also inconsistent with his innocence, such evidence in weight and probative force may surpass direct evidence upon its effect upon the court and jury." *Ex parte Jefferies,* 7 Okla. Cr. 544, 124 Pac. 924, 41 L. R. A. (N. S.) 749.

While the evidence leaves in doubt whether one or both of the defendants actually fired the shot or inflicted the knife wound that caused the death of the deceased, yet, the evidence showing beyond a reasonable doubt that a conspiracy existed between the defendants to commit the robbery, and that the homicide was incidental to the robbery, it is entirely immaterial whether one or both of them did the actual killing. Both are equally guilty.

"Where parties voluntarily act together in the com-

mission of an act which may result in death to another, and such death ensues therefrom, all such parties so acting together are as guilty of the murder as if they had intended the death of such party."

"The responsibility of coconspirators is not confined to the accomplishment of the common purpose for which the conspiracy was entered into, but extends to and includes all collateral acts incident to and growing out of the common design." *Holmes v. State,* 6 Okla. Cr. 542, 119 Pac. 430.

"The least degree of concert of action or collusion makes the act of one conspirator the act of all." *Ex parte Hayes,* 6 Okla. Cr. 321, 118 Pac. 609.

There being evidence that the defendants, acting conjointly, committed the offense charged as an incident of the attempted robbery, the court did not err in refusing to advise an acquittal for the defendants.

The judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.