# R. S. LUNA v. STATE.

No. A-9183.  Sept. 23, 1937.
(71 Pac. 2d 1101.)

Houston B. Teehee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, J.   Upon an information charging R. S. Luna, Fred Luna, A. W. Clinton, Cleasey Clinton, and Roy Miller with the larceny of a steer, the property of Walter White, in Cherokee county on or about the 23d day of September, 1935, the defendants R. S. Luna and Fred Luna were jointly tried.   The jury returned verdicts finding defendant Fred Luna not guilty, and finding defendant R. S. Luna guilty, but failed to agree upon the punishment.   His motion for a new trial was overruled February 1, 1936, and the court sentenced him to serve a term of four years in the state penitentiary.

To reverse the judgment, he appeals.

In the view we take of this case, it is only necessary to consider the assignment that this conviction was had contrary to the law, in that the evidence was insufficient to support the verdict and judgment of conviction, for the reason that the only evidence tending to connect appellant with the commission of the crime charged, was the testimony of Miller and Clinton, codefendants and confessed accomplices, and that therefore the court erred in refusing to direct a verdict of not guilty.

The testimony of Grover Bishop, sheriff, was to the effect that he gave the codefendant, Roy Miller, a deputy sheriff's commission but did not make that fact known to the public; that acting on information that livestock was about to be stolen in the neighborhood where codefendant A. W. Clinton lived, he proceeded there with Deputy Billy Ballew that night and stopped near Markes Dixon's place, about a quarter of a mile from Clinton's

place. About 10 o'clock Rob Luna and his son, Fred Luna, came by in a truck hauling a yellow Jersey steer, and he arrested them.

Billy Ballew, deputy sheriff, testified that codefendant Roy Miller sent word to him by Markes Dixon that some livestock was to be stolen near there that night, and in company with the sheriff he went there that night; they stopped Rob and Fred Luna who were hauling a steer on a truck; that the sheriff asked Rob Luna where he got that steer. Rob said, "I bought it from Ab Clinton, gave him a $10 check for it," then said something about giving $20 for it.

The alleged owner, Walter White, testified simply that the Jersey steer belonged to him, and that he did not give any person permission to take it. That after recovering the animal, he sold it for $18.

Ab Clinton, codefendant, as a witness for the state, testified that he lives near Cookson; that on or about September 23d, last year, codefendant Roy Miller came to his home and told him he was getting a steer for Rob Luna, and Rob would give them $10 to get it up, and they got the steer; that about 10 o'clock that night Rob Luna and his son, Fred, came to his place; when that truck drove up Rob Luna asked where this steer was; Roy Miller told him in the hog lot shed, and with Roy Miller he took and loaded the steer in their truck. Miller asked him how much he was going to give for getting up that steer, and Rob said $10. That he told Rob if he got caught with that steer to take it on himself, and Rob told him not to worry; if he got caught he would. That Rob wrote a check by the light of the truck for $10, payable to the order of A. W. Clinton; that he did not see any money paid. The check, dated September 24, 1935, on the First

National Bank of Fort Gibson, was signed, "W. S. Luna," indorsed, "A. W. Clinton," and was admitted in evidence.

Mrs. Markes Dixon testified that she lives three miles north of Cookson; that she saw the Jersey steer at her place in a lot; that Rob Luna and his son Fred were there the day the steer was in the lot, and Luna asked her husband who owned the steer. Carol Harding answered and said it belonged to Phillip Cone. That the steer jumped out of the lot and went away; that Roy Miller was at her place that day and told her what was going to happen; that she knew that he was working down there for the sheriff, and Miller told her to tell her husband to tell the sheriff; that she told her husband, and her husband told the sheriff, that Rob Luna had made plans to get the steer.

Markes Dixon testified that he sold some cattle on or about the 23d of September, last year, and when they were lotted he found three steers there that did not belong to him; one was yellow with a crop off and a split in each ear. Carl Harding was there and said: "That is Phillip Cone's steer"; that he knew the brand, and said he was going to town and would come by and take it that evening; that when Harding came back the steer was gone; that his wife said it jumped out of the lot; that Rob Luna was there that day; that his wife told him Luna was going to take the steer, and he told Billy Ballew to watch the Barber Road at the foot of Molly Brown Mountain; that Roy Miller would have the steer there that night between 9 and 10 o'clock for Rob Luna to load.

Roy Miller, on behalf of the state, testified that he lives three-quarters of a mile from Markes Dixon and helped Dixon to put his cattle up; three strays, one this Jersey steer, were put in the lot; that Rob Luna and his

son were there that day and Mr. Harding was there in a truck with Rance Blair, and Harding said the Jersey steer belonged to Phillip Cone, that when he came back from town he would take it; that September 20, 1935, he was appointed a deputy sheriff and produced his commission signed, "G. C. Bishop, Sheriff"; that he had a conversation with Rob Luna at the Dixon lot after Harding told him who owned the steer, and Rob told him he would pay him to get the steer up for him; he told Rob that he would have to have some help, and they decided to get Ab Clinton to help and to have the steer ready that night between 9 and 12 o'clock between the foot of the mountain, near the Barber Road; that he told Mrs. Dixon about this and told her to get in touch with Billy Ballew; that evening he and Ab Clinton got the steer up, and he told Clinton it was a stolen steer; that he met Rob Luna and his son that night just above the Barber Road and went with them on the truck to Ab Clinton's place, where they had the steer in a shed, and with Ab he took the steer out and put him in the truck; that Rob gave Ab a $10 check on the Fort Gibson bank.

On cross-examination he stated that he told Rob Luna that he did not want a check, he wanted the money; that he was going to get $5 out of the check; that he cashed the check because the officers told him that he could use whatever money he could get out of anybody.

At the close of the state's case, counsel for appellant moved the court to instruct the jury to return a verdict of not guilty, for the reason that the state has wholly failed to make out a case against this defendant.

On the part of the defense, Carol Harding testified that he was at Markes Dixon's place and called attention to a steer that was in his pen as belonging to Phillip

Cone; that the defendant, Rob Luna, or Fred, his boy, were not there at that time or any time while he was there; that he was in attendance as a witness for the prosecution, but was not called by the state.

George Cole testified that he came to Dixon's place in the car with Rance Blair and heard Carol Harding say that a steer in the lot belonged to Phillip Cone; that Rob Luna or his son Fred were not there while he was there; that Roy Miller, Mr. Sharp, Mr. Blair, and Mr. Harding were there; that he heard Markes Dixon tell Mr. Blair, who said he was going to make a bid on the cattle, that this brown steer is a stray. Asked if he knew the general reputation of Roy Miller in the community where he lived for truth and veracity, answered "Yes"; asked what it was, answered, "It was bad."

Jack Nichols, Billy Lambert, and Albert Lowery each testified that he knew the general reputation of Roy Miller for truth and veracity in the community; asked, "Is it good or bad?" replied that it was bad.

As a witness in his own behalf, Robert S. Luna testified that his business was buying cattle and hogs; that he was at Dixon's place when his cattle for sale were in the lot; that Mr. Harding was not there at that time; that he met a man there who said his name was Roy Miller and had a conversation with him about buying some cattle. Miller said a fellow by the name of Clinton that lived on Elk creek, but was working over on the river about two miles from there at a club house, had a steer, a cow, and a heifer to sell; that he told Miller he would go over there the next morning and look at them, Miller said Clinton would not be at home in the morning, and he could not be there himself as he was going down to Snake Creek in the morning to work on the road. That

Miller insisted on his coming that night, saying he would go down there and get the cattle up for him, and Clinton would be back home about dark; that he asked him the best way to get to the Clinton place, and he said there were two ways, one to go down the Barber Road and the other way to go up to the foot of Molly Brown Mountain; that he left home about sundown with his son and his niece that lived with him, and had car trouble on the road near Albert Carter's place which delayed him about an hour; that he met Miller on the Barber Road, and asked him if he had the cattle up; Miller said he only had the steer, and he told Miller it would not pay them to go down there to get one steer this late. Miller insisted on his going, said he needed some money out of it, and they drove on down there. The steer was in a shed; that he had never before that day met either one of the men; that he bought and paid $20 for the steer; that Miller did most of the transaction talk, but he bought the steer from Clinton; that he thought they were brothers-in-law; that he told Clinton he would have to give a check; he said he did not want a check, that he had to have some money; then he told them he could not buy the steer; after some talk he told him that he would pay $10 in cash and give a check for $10. Miller said, "Will they cash the check down at the store?" He told them, "Yes," and Clinton said, "All right, I will take the check." His son wrote the check for $10 and he signed it. After tying up this steer, he gave Miller the $10. That on his way back the officers stopped him about a mile from his home. The sheriff got out and said, "What have you got here?" He answered, "A steer." The sheriff said, "Where did you get it?" He told him over on Elk Creek; he didn't know the man's name and asked his son; Fred said, "His name is Ab Clinton." The sheriff

asked what he gave for the steer, and he told him a check for $10 and $10 in cash. The sheriff said, "Well, I will have to take you to town." He asked him what was the matter; that he was willing to go over with him to where he bought it. The sheriff said, "No, there has been too damn much of this going on now, I will take you to town," and told him to get in the car with Billy Ballew; the sheriff got on the truck with Fred, and they all came on to town.

The defendant then produced the statement of his account at the First National Bank at Fort Gibson, and more than 40 canceled checks, each showing the name of the owner of the livestock purchased which were admitted in evidence. Nearly all the checks were issued in payment for livestock purchased in the months of July, August, and September, 1935.

On cross-examination he stated that he lived about 25 miles southeast of Tahlequah, and had lived there practically all his life; that he met Miller that night about a mile from the Clinton place; he would judge it was then between 9 and 10 o'clock.

Fred Luna testified that he had been engaged for several months with his father in buying cattle and wrote the checks when he was with his father. That evening he went with his father because they had trouble with the truck. They left home between sundown and dark; his first cousin and her little boy were with them. Near Carter's place the motor quit running, and he worked on it fifteen or twenty minutes before it started; after going a couple of miles it quit running again. He took out the carburetor and fixed it; it took something like an hour; that his cousin got out at the bridge. At the foot of Molly Brown Mountain they met Roy Miller. "Dad

asked him if he had the cattle up, he said, 'No, I haven't got anything but one steer,' and dad said, 'I don't believe I will go down this late, I have been having trouble with my truck, I don't believe I will go down there tonight; you tell Clinton when he gets up the rest of his cattle I will go down and try to buy them.' " That Miller insisted on going down that night and buying this steer. He said they needed the money, so they went down to Clinton's place. When they got there his dad with Miller and Clinton walked out to the shed. His dad struck matches, looked at the steer, and asked them what he would have to pay for the steer. One of the two said it ought to be worth $20, and his dad said he would buy it. When they loaded the steer his dad said he would have to give a check; they said they needed money and did not want a check, and he told them he could not buy it then; they asked how much money he had; he said $10. They said all right, and he told him to write a check for $10. That he asked Miller who to make the check payable to. Miller said to Clinton. That Miller had the $10 bill in his hand when he gave him the check; that he never saw Miller before, and had seen Clinton and his son at the store one time; that they had traveled from the Clinton place about six miles when the officers overtook them.

On cross-examination he stated that Sheriff Bishop and Billy Ballew passed his home that evening while he was working on the truck in front of the gate.

The state in rebuttal recalled Sheriff Bishop, who testified that with Billy Ballew he passed the defendant's home that evening and stopped near the Molly Brown Mountain; that he told Roy Miller to stay out of the way, that he wanted to hook up with them and get what

he could catch; that he did not intend to take Miller up on this charge; that he knew the kind of character Miller was.

Upon a careful review of the record and the evidence in the case, we are of opinion that the motion for a directed verdict of acquittal should have been sustained.

This conviction rests on the testimony of codefendants Roy Miller and A. W. Clinton. Under the statute (Penal Code [1931] § 3071 [22 Okla. St. Ann. § 742]), a conviction could not be had on their testimony unless they were corroborated by other evidence, which in itself, and without the aid of their testimony, tended to connect the defendant with the commission of the offense.

In Rogers v. State, 57 Okla. Cr. 294, 48 Pac. 2d 344, 346, we said:

"The rule of law forbidding a conviction upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense is, under the statute (section 3071, St. 1931 [22 Okla. St. Ann. § 742]), positive and peremptory. * * *

"Under the statute, section 3071, supra, there cannot be a conviction unless there is proof of substantial facts tending to connect the defendant with the commission of the offense, aside from and without the aid of the accomplice's testimony, and it is self-evident that the main facts in this case cannot be corroborated by a collateral fact, the existence of which is dependent upon the same class of testimony. Kirk v. State, 10 Okla. Cr. 281, 135 Pac. 1156; State v. Wilks, 17 Okla. Cr. 247, 187 Pac. 813; Wever v. State, 22 Okla. Cr. 414, 211 Pac. 1062."

In Hanna v. State, 30 Okla. Cr. 354, 235 Pac. 928, this court held that under the statute (section 3071, supra) providing that:

" 'A conviction canot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof,' one accomplice cannot corroborate another so as to authorize a conviction upon the testimony of the two accomplices alone."

And see Yeargain v. State, 57 Okla. Cr. 136, 45 Pac. 2d 1113.

Independent of the testimony of the accomplices, there is no substantial evidence tending to connect the defendant with the commission of the crime charged. When the testimony of these two accomplices is excluded, the only testimony remaining is that of Mr. and Mrs. Markes Dixon, which tended only to show that she was a go-between between Roy Miller and the other officers.

In Shouquette v. State, 25 Okla. Cr. 169, 219 Pac. 727, 731, it is said:

"Ordinarily, it is not against public policy for officers to set a trap for one suspected of planning the commission of a crime, and, if he commits the crime, even though aided or encouraged by the officer who laid the trap, the fact that he was so entrapped will be no defense. This rule will not apply, however, where the decoy proposed a robbery, and was the chief moving actor in the forcible taking of the property. To hold the aiding offender criminally responsible, he must have participated in every ingredient of the offense charged. [Citing cases.] * * *

"Gustafson and Brown were peace officers—officers of the court—who were in part responsible for this alleged robbery. So frequently it has been demonstrated, and the facts in this case again demonstrate, that the practice of employing one thief to catch another, by participating with him in the commission of the offense, is of doubtful propriety. It is a bad investment, financially."

The state only demands the punishment of a citizen when his guilt has been clearly established according to the forms and rules of law, prescribed for ascertaining his guilt. It is not to shield the guilty, but to protect the innocent, that the courts are steadfast in upholding the forms and rules of law by which it may be lawfully determined who are guilty.

Carefully considering the evidence in the case, we are clearly of the opinion that the testimony of the accomplices was not corroborated as the law requires, and for this reason the verdict was contrary to law and the evidence.

The judgment of the district court of Cherokee county is therefore reversed and the cause remanded, with direction to dismiss.

DAVENPORT, P. J., and BAREFOOT, J., concur.