# FRANK WILKINS v. STATE.

No. A-9642.   June 26, 1940.

(104 P. 2d 289.)

2

Dudley, Hyde, Duvall & Dudley and Charles Hill Johns, all of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis R. Morris, Co. Atty., and John Eberle, Asst. Co. Atty., both of Oklahoma City, for the State.

BAREFOOT, J. The defendant was charged jointly by a grand jury indictment with Ed W. Spivey and R. H. Price, in Oklahoma county, with the crime of bribery; was tried, convicted and sentenced to serve a term of seven years in the penitentiary, and has appealed.

The indictment in this case was returned by a grand jury of Oklahoma county on July 2, 1938. Defendant was tried and convicted on the 29th day of October, 1938. His appeal was filed in this court on the 2d day of May, 1939. This case was finally submitted to this court on the 22d day of November, 1939. The final brief was filed April 12, 1940.

A brief statement of the facts are: Ed W. Spivey and R. H. Price were two of an eight-member board of education of the Oklahoma City school district. Defendant was a regularly constituted and appointed attorney for the said board of education. Prior to the 14th day of September, 1936, a large oil pool had been discovered within the limits of Oklahoma City, and much of the school district property had become valuable as prospective oil producing property. The board of education, in a proper and lawful manner, advertised for bids for the sale of the royalty rights of said district upon certain tracts of property owned by the school district. Among these different tracts was the royalty on what was known as the "Northeast high school" royalty. The bids for these various tracts were in writing, and in conformity with the advertisements. When the bids were opened it was found that one S. Leroy Estes had bid the sum of $20,103 for the royalty interest of the board of education in and to

the Northeast high school royalty. Ed W. Spivey and R. H. Price, were members of the oil and gas committee of said board, and it was upon the recommendation of said board, and the defendant, as attorney for said board, that said royalties had been offered for sale, and it was upon the recommendation of the said Ed W. Spivey, as chairman, and the defendant, attorney for said board, to whom the different bids had been submitted, that the bid of the said S. Leroy Estes, for the purchase of the Northeast high school royalty be accepted, and that the other bids for royalties upon other school properties be rejected. The evidence reveals that this deal was finally closed in the office of the defendant; the royalty deeds were prepared by defendant, duly executed by the board of education, and the secretary, and the school district was paid in full the sum of $20,103, as bid by the said S. Leroy Estes.

In the brief of defendant a statement of the evidence offered by the state is given. This statement is so concise and fair that in the brief for the state it is said:

"The general statement made by defendant in his brief, beginning on page 29, and extending to page 48, sets out, with reasonable accuracy, a general outline of the evidence and testimony of the witnesses primarily relied upon by the state in establishing the elements of the offense charged against the defendant. It will not be necessary, therefore, to reiterate in this brief a general outline of this evidence and oral testimony."

After reading the record we agree with this statement and give the same as it appears in the brief of the defendant.

Watts was employed by Oklahoma City, but was an oil and gas broker on the side. He knew Spivey and had known him for several years and referred to him as Uncle Ed. In the early part of September, 1936, Watts interested

himself in an effort to sell, as a broker, some of the board's royalty. He learned from the clerk-business manager that Price was chairman of the oil and gas committee, and thereupon contacted him and inquired if the Northeast high school royalty was for sale, and if so the price thereof. Price told him the royalty might be for sale and asked him what he would give, but he declined to make an offer, and then Price referred him to the defendant as the board's attorney. He left Price and went to the office of the defendant and made inquiry of him as to the sale of said royalty. The defendant made some brief reference as to the sale procedure and referred him to Spivey. Shortly following this Watts contacted Spivey and made inquiry about the sale of said royalty, and on being advised that the royalty might be for sale Watts told Spivey that he had talked to Price and the defendant. No price was agreed upon during this conference with Spivey, but Watts told him he would figure on the price and see him later.

After Watts had this conversation with Spivey, he contacted Estes for the purpose of interesting him in the purchase of the royalty. Estes was interested and told him to find out what the price was. Watts contacted Price again and made him an offer of $20,000, and thereupon the following conversation took place between them, according to Watts: He, Price, said:

"It wasn't enough money; so, he said, I would have to raise my bid; so, I asked him, then, well, would there be anything on the side and he kinda looked at me and shook his head and he told me, or, he asked me if I knew Mr. Spivey, and I told him, 'yes, sir' and I knew him real well and I had known him as 'Uncle Ed', I had bought several hundred dollars worth of furniture from him. He referred me back to see Mr. Spivey again so I went back to see him."

Following this Watts contacted Spivey the second time and during this conversation Spivey proposed to sell said royalty for $20,000 to the board and $6,000 on the side. Watts relayed this proposal to Estes and secured his approval of the deal, which fact he, Watts, reported to Spivey and told him that Estes would see him later. Estes saw Spivey and confirmed the deal which Watts had made, and thereupon Watts went out of the picture and Estes took on the negotiations. After the deal was closed on September 17, 1936, Estes paid Watts $775 for his services evidenced by a check of that date. Smith as a matter of fact furnished the money.

After the Northeast high school royalty bribe transaction was closed and Watts received his proportionate share of what he termed his commission, he initiated another bribery deal in the spring of 1937 for the Webster royalty. His associate in this deal was William Eckroat and this deal may be termed the Watts-Eckroat-Spivey deal. Estes and Smith, the associates of Watts in the other deal, were not parties to this transaction. This is true as to Price and the defendant. Eckroat and Watts were to divide the profits equally. Watts contacted Spivey and made a deal with him by which Eckroat was to bid $25,000 for the Webster royalty and pay $6,000 on the side, making a total purchase price of $31,000. Watts reported this deal to Eckroat and secured his approval thereof and thereupon Eckroat claims to have prepared a bid of $25,-000 which either he or Watts claims to have filed with the board of education. The records of the board of education do not show that such a bid was ever filed. The clerk-business manager testified that he never saw or heard of such a bid, but that there was some discussion among the members of the board about an Eckroat proposal of some kind. There was some proof to the effect that the

board passed a resolution accepting this bid. Be this as it may, the Eckroat transaction was never consummated, but the record does show that both Watts and Eckroat were willing to bribe Spivey in order to put this deal through.

While this deal was on, Estes and Smith upon the one hand and Spivey and the defendant upon the other had another bribery deal on for the purchase of this royalty by which they were to pay $21,000 to the board and $7,000 on the side, making a total of $28,000. Neither one of these deals was consummated, but the record shows that Estes and Smith were willing to put over another bribery deal with Spivey and the defendant, and that after they were unable to do so they turned their guns loose upon the board of education and undertook at all odds to buy the Webster royalty, but did not. We shall presently outline the history with reference to the sale of the Webster royalty and their activities in connection therewith.

The testimony of Watts, direct and cross, appears in the record, and is substantially as herein set out.

Estes was born in Chickasha, attended the public schools of Bartlesville, and while there met and became acquainted with Harold Dodson, the young lawyer hereinbefore referred to as officing with the defendant. Estes moved to Oklahoma City in 1931, and lived there until July, 1938, during which time he was engaged in the royalty business. At the time he testified he was living in Abilene, Tex., and engaged in the same business there. He knew Smith and had been associated with him in some business matters. He also knew Watts in a general way. He knew neither the defendant nor Spivey until he met them in connection with the purchase of the Northeast high school royalty. He met and talked to Price about two months before he was contacted by Watts.

In the early part of September, 1936, Watts told Estes of the deal he had on with Spivey to purchase the Northeast high school royalty for $20,000 to the board and $6,000 on the side, and asked him if he was interested in the deal. Estes told him that he was. Thereupon Watts directed Estes to contact Spivey. This Estes did and Spivey confirmed the deal as outlined to Estes by Watts. Spivey directed Estes to contact the defendant and made an appointment with the defendant for Estes by telephone. Estes went to his office and talked to him with reference to the deal and the defendant told him, so he, Estes, said, that he, the defendant, understood the deal and that the payoff amount was correct as he understood it. Estes was not financially able to purchase the royalty and make a pay-off, so he interested his friend and associate Smith, who agreed to finance the deal, with knowledge of the nature thereof.

On September 12, 1936, Estes, with the approval of Smith, prepared and filed a bid with the board of education, by the terms of which he proposed to pay $20,103 for said royalty. This bid was accompanied by a certified check for $5,025.75; $103 was added to the agreed price with the hope that the bid would be in excess of any other bid around $20,000. This bid, as aforesaid, was approved by the board at its meeting of September 15, 1936, and thereafter Estes, in conjunction with Smith, prepared the mineral deed hereinbefore referred to, and presented the same to the defendant and secured his approval thereof.

During the afternoon of September 16, 1936, Estes claims to have met the defendant and Spivey at the Biltmore Hotel and while there discussed with the defendant the method and manner of closing the deal and paying the payoff, and as a result of this conference with defendant

it was agreed that Estes would come to defendant's office on the following day, bring the mineral deed and the payoff of $6,000 in currency. Estes advised Smith of the arrangement so made with the defendant and requested Smith to arrange for the currency and deliver to him on the following day.

On September 17, 1936, Estes met Smith in front of the Woolworth Building, on Main street, in Oklahoma City. Smith had a brief case with him when they met containing two packages of currency, the one of $500 and the other of $6,000. The brief case containing these packages was turned over to Estes by Smith, and they went from there to the office of the defendant. The defendant, Price, and Dodson were there when they arrived. The mineral deed had not been signed by Rose, the president of the board, and the defendant phone Rose to come over and sign the deed, which he did in the presence of Estes, Smith and the defendant. Stearley, the clerk-business manager, was sick at home. He had not attested the mineral deed. At the request of the defendant, Dodson and Smith went to Stearley's home to have him attest the deed. When they left Price, Rose, Estes and the defendant were in his office. Estes was the grantee in the mineral deed, and he had executed and delivered to Smith a mineral deed conveying the minerals to him and when Smith left with Dodson he, Smith, had both deeds, and the understanding between Estes and Smith was that Estes would hold the $6,000 until he, Smith, phoned him that the two deeds had been filed for record. There was no discussion of the payoff in the office of the defendant while Smith and Dodson were there, and there was no discussion between Estes and the defendant about the payoff until Price and Rose left the office. Estes and the defendant remained in the office alone for some time and they had a discussion with refer-

ence to the payoff, the amount of money Estes had and the denomination of the bills. Estes received a telephone call from Smith while in the office of the defendant and thereupon turned over and delivered to the defendant $6,000 in currency.

After the payoff was made, and as Estes was leaving the office, the defendant suggested to him that he and Smith should give a party for the members of the board. This Estes agreed to do. He then went to Smith's office and advised him that the payoff transaction had been completed and they thereupon settled with Watts. Smith and Estes arranged for a party at the Biltmore Hotel that evening. Estes registered as Johnny Evan, and was assigned room 703. Spivey, his brother-in-law, and the defendant attended the party. The party lasted some time, and at one stage of it Smith proposed to pay for some liquor, and thereupon, according to Estes, Spivey said: "Let me pay for it. I have got a thousand dollars of your money, anyway," and then Estes said: "And just kinda making a joke of it, and he just said it in a kind of a joking way."

As to the defendant he was asked:

"Q. I will ask you to state if you recall if there was anything said about who was making the most money out of this Northeast high school deal? A. That was a conversation between Mr. Wilkins and myself. Q. What was that conversation? A. I think I had told Mr. Wilkins that they had made more money out of this deal than Mr. Smith and I would. Q. What did he say? A. I think he just remarked to me, then, that we would make plenty of money on it, something like that. Q. In other words, just general conversation? A. Yes, sir."

In the spring of 1937 Estes and Smith initiated a deal with Spivey and the defendant for the sale of the Webster royalty on the basis of $21,000 to the board and $7,000 on

the side, making a total of $28,000. Following this Estes and Smith, in the name of Estes, made an oral bid to the board for $21,000 for this royalty; that at the time this bid was made there were written bids before the board for much larger amounts. The aforesaid Eckroat bid was before the board at that time, so Estes and Smith understood, and they were informed from some source that the Eckroat bid was or would be accepted, and they complained, both to the defendant and Spivey, that they had been double-crossed. Following this a meeting was had at the home of the defendant and there were present on this occasion Estes, Smith, Jeff Martin, Capshaw and the defendant. Estes and Smith were mad and sore and claimed that both Spivey and the defendant were of the opinion that Eckroat could not carry out his bid, and Estes claims that the defendant proposed that the payoff be reduced to $4,500 and that he and Smith take on the Eckroat bid of $25,000 plus a payoff of $4,500. This Estes and Smith declined to do, and the proposed payroll deal terminated, and on April 23, 1937, Estes, for and on behalf of himself and Smith, filed a bid with the board for $26,000 for the Webster royalty. The grand jury convened on May 31, 1938. Ten days or two weeks before this Estes testified with reference to two or more conversations which he claims to have had with the defendant.

The testimony of Estes, direct and cross, is substantially as herein set out.

Smith lives in Oklahoma City and is engaged in the royalty business. He is a member of the bar but not engaged in active practice—he is on the inactive list. He knows Estes and through him became interested in the purchase of the Northeast high school royalty. Estes outlined to him the deal which he had on to purchase this

royalty for $20,000 to the board and $6,000 on the side as a payoff, and asked him to finance the deal, which he agreed to do. Estes filed the bid in his name for the use and benefit of himself and Smith, accompanied by a cashier's check of $5,025.75 furnished by Smith. Estes advised him that Watts had initiated the deal and that he would have to be taken care of in the consummation of it. Smith agreed to pay Watts and the amount which Estes paid him was furnished by Smith.

On September 14, 1936, Smith purchased a cashier's check from The Fidelity National Bank of Oklahoma City for $6,000, payable to the board of education. This cashier's check accompanied the bid of Leo J. Portman hereinbefore referred to, covering the Webster royalty. The Portman bid was returned together with the cashier's check and Smith as a matter of fact was back of this bid.

Smith was advised by Estes that the Estes bid had been approved by the board and under Smith's direction Estes prepared said mineral deed and secured the approval thereof by the defendant. Smith knew of the arrangement which Estes had with the defendant to close the transaction on September 17, 1936, and make the payoff of $6,000. On the morning of September 17, 1936, Smith received the currency on said cashier's check of $6,000. He drew from his bank account the additional sum of $500 in currency, making a total of $6,500. The banker, at his direction, placed $6,000 of currency in one envelope and the remaining $500 in another and put both envelopes in a brief case left by Smith. Shortly following this Smith returned to the bank, picked up the brief case and met Estes by appointment in front of the Woolworth Building and there turned over the brief case containing the two envelopes to Estes. After this was done they went to the

office of the defendant and Smith's testimony as to what occurred there is substantially the same as that of Estes and we will not restate it here.

Smith and Dodson went from the defendant's office to the home of Stearley, the clerk-business manager, where he attested the mineral deed. From there they went to the office of the board of education where the mineral deed was formally acknowledged and delivered upon payment of the purchase price. From there they went to the court-house where they separated. Smith filed the two mineral deeds for record, the one from the board to Estes and the other from Estes to himself. He thereupon phoned Estes at the office of the defendant that the two deeds had been filed for record. This phone conversation occurred around the noon hour and shortly after noon Smith and Estes met in Smith's office where Estes made a report as to the pay-off. They arranged a party at the Biltmore Hotel for that afternoon and evening. They were both there and claim that Spivey and the defendant, and probably Price, were there. The testimony of Smith as to what occurred at the party is substantially the same as that of Estes, except that Smith testified he got drunk and did not know exactly what did occur after that.

In the Spring of 1937, Smith joined Estes in a deal to purchase the Webster royalty for $21,000 to the board and $7,000 on the side as a payoff. His testimony in this regard is substantially the same as that of Estes. He also attended the meeting at the home of the defendant and his testimony as to what occurred there is substantially the same as that of Estes.

After the Webster payoff deal failed, and on May 14, 1937, Smith wrote a letter on behalf of the Investment Royalties, Ltd., to said clerk-business manager, wherein,

among other things, he said: "Should you desire to sell this property (Webster royalty), may we request that we be advised, because we want to bid on the property; and unless some drastic change has taken place in the condition of the well at the time you are ready to accept bids, you may also be advised that we would place a bid in excess of any bids heretofore given to the board of education."

Said clerk-business manager replied to this letter under date May 17, 1937. On May 18, 1937, Smith, for said above-mentioned company, wrote another letter to said clerk-business manager wherein he proposed to pay $30,-000 for the Webster royalty. The letter of May 14, 1937, also appears in the record. Smith wrote a similar letter as of that date to each and every member of the board, and these letters appear in the record. These letters were registered and the registery record appears in the record.

Before the grand jury convened, or during its session, Smith testified concerning one or more conversations which he had with the defendant, either in person or by phone, and his testimony in this regard appears in the record.

The testimony of Smith, direct and cross, appears in the record, and is substantially as hereinabove set out.

Other witnesses for the state testified to certain facts which corroborate the evidence heretofore given, but reference will only be made thereto as needed in a discussion of the leading questions raised by this appeal.

The defendant offered as a witness Otto Rose, president of the board of education, who testified as to his part of the sale of the royalty and the signing of the deeds as related by the witnesses. That the sale as far as he was concerned was a genuine one; that defendant never discussed transaction with him or asked him to support the Estes sale, and that no member of the board of education

ever asked him to support the Estes sale; that he did not attend the "Biltmore Hotel Party"; knew nothing about it, and had nothing to do with it. That he never at any time received any money for the payoff of the Northeast high school royalty or of any other royalty deal.

The same evidence was given by Robin Knight and Mrs. J. S. Pool, who were also members of the board of education. Neither of them knew of any royalty payoff, and neither of them received any part of the payoff.

Defendant, as a witness for himself, denied the evidence of the state's witnesses heretofore given. He denied receiving the $6,000 from Estes or any part thereof in connection with the sale of the Northeast high school royalty, and knew nothing of any payoff in connection therewith. The same was true of the Webster royalty, and also other payoffs as testified to by the state's witnesses.

The defendant was indicted, convicted, and sentenced under section 1907, Okla. St. 1931, O. S. A. title 21, sec. 382, which provides:

"Every executive, legislative, county, municipal, judicial or other public officer, or any person assuming to act as such officer, who corruptly accepts or requests a gift or gratuity, or a promise to make a gift, or a promise to do an act beneficial to such officer, or that judgment shall be given in any particular manner, or upon a particular side of any question, cause or proceeding, which is or may be by law brought before him in his official capacity, or as a consideration for any speech, work or service in connection therewith, or that in such capacity he shall make any particular nomination or appointment, shall forfeit his office, be forever disqualified to hold any public office, trust or appointment under the laws of this state, and be punished by imprisonment in the state penitentiary not exceeding ten years, or by fine not exceeding five thousand dollars and imprisonment in jail not exceeding one year."

The defendant was not a member of the board of education but was employed as its attorney and legal adviser. He took no oath of office as did the members of the board of education, nor was any required. It is contended that under the statute above quoted he is not subject to prosecution. It being claimed that he was not an executive, legislative, county, municipal, judicial or other public officer which made him amenable to the term of the statute. It is also contended that his codefendants, Spivey, and Price, who were members of the board of education, do not come within the terms of the statute, and if they do not come within its terms, the defendant, who is jointly charged with him, cannot therefore be convicted under its terms.

In the case of Spivey v. State, 69 Okla. Cr. 397, 104 P. 2d 263, decided on the 13th day of June, 1940, we held that a member of the board of education came within the terms of the statute and his conviction was affirmed. We held in that case that a member of a city board of education was an "executive officer" within the terms of the bribery statute, and that an "executive" and "administrative" officer were the same.

The question now arises that even though the statute applies to the codefendants, Spivey and Price, does it apply to the defendant who holds the appointive position as attorney to the board of education, and who is not required to take the oath of office as are his codefendants?

In 8 American Jurisprudence, page 896, it is said:

"Here, however, it may be noted that a person may be guilty of a conspiracy to commit bribery, even though he could not by reason of his status, commit bribery."

Also, in 11 American Jurisprudence, page 547, section 7, it is said:

"A person may be liable as a conspirator, even though he is incapable of committing the crime which is the purpose of the conspiracy."

Also, in 5 Ruling Case Law, sec. 3, page 1063, it is said:

"A person may be liable as a conspirator, even though he is incapable of committing the crime which is the purpose of the conspiracy."

Under Oklahoma Statutes 1931, section 1808, O. S. A. title 21, sec. 172, it is provided:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

It will, therefore, be noted that by the enactment of the above statute the rule of the common law has been changed and those who, under the common law, were classed as principals, principals in the first degree, and principals in the second degree, accessories at the fact and accessories before the fact, are by this statute made principals, while those classified as accessories after the fact are, by the terms of the statute, denominated accessories. Drury v. Territory, 9 Okla. 398, 60 P. 101; Wishard v. State, 5 Okla. Cr. 610, 115 P. 796; Sturgis v. State, 2 Okla. Cr. 362, 102 P. 57; Valdez v. State, 18 Okla. Cr. 204; 194 P. 451; Methvin v. State, 60 Okla. Cr. 1, 60 P. 2d 1062.

Having held that the codefendant Spivey was amenable to the statute under which he and defendant were indicted, and in which it is charged: "* * * did conjointly and while confederating and acting together, unlawfully, willfully, purposely, corruptly and feloniously commit the offense of bribery, in the manner and form as follows, to wit. * * *"

Does the defendant, if he aided and abetted the codefendant Spivey in the commission of the offense charged, become a principal and therefore become amenable to the terms of the statute in the same manner as does his codefendant Spivey? Under the evidence introduced in this case by the state, and as found to be true by the jury, the defendant was one of the moving spirits in carrying out the conspiracy. His codefendants, Spivey and Price, referred those to him who had approached them with reference to the payoff. The defendant passed, not only upon the legality of the papers which were prepared in the consummation of the deal, but he actually helped to negotiate the deal, and it was to him, and in his own office, that Estes delivered the $6,000 in cash, the very amount it was agreed should be paid in excess of the bid offered by the witness. The money was taken from the brief case, and delivered in cash to the defendant himself. It was at his suggestion that the party at the Biltmore Hotel was arranged in celebration of the payoff. He was personally present at the party and participated therein. Under these facts as applied to the law there can be no question that he "aided and abetted", and was therefore a principal, as provided by the terms of the statute above quoted. The verdict of the jury finding the defendant guilty where the evidence was conflicting, as in this case, will not be set aside by this court.

In People v. Anderson, 75 Cal. App. 365, 242 P. 906, 909, it is said:

"Appellant Morewood contends that, as section 68 of the Penal Code only refers to certain officers as being amenable to its provisions, and that as it is neither alleged nor proven that he was an officer of the class mentioned in said section of the Code, nor any officer whatever, he could not be found guilty of bribery as charged in the

indictment; therefore the judgment against him cannot stand. It is true that as a private citizen he could not as a principal be guilty of the crime of bribery as defined by the above Code section. But in conjunction with one or more of the officers mentioned in said section of the Code, and as an accomplice of such officer, he could be guilty of the crime as defined by said section 68. Pen. Code, §§ 31 and 971; People v. Bartol, 24 Cal. App. 659, 142 P. 510; People v. Horn, 25 Cal. App. 583, 144 P. 641; Bishop v. State, 118 Ga. 799, 45 S. E. 614."

See, also, Capshaw v. State, 69 Okla. Cr. 440, 104 P. 2d 282.

In 5 A. L. R. 782, the general rule is stated, as follows:

"There are some offenses which are so defined by statute or by the common law that they may be committed only by certain persons or classes of persons. Nevertheless, a person who is not within the class of those by whom the crime may be directly perpetrated may, by aiding and abetting a person who is within the scope of the definition, render himself criminally liable."

Many cases from the different states are cited in support of this rule, and it is unnecessary to here cite them.

In the case of Watson v. State, 158 Tenn. 212, 12 S. W. 2d 375, 377, it is said:

"It is conceded on the brief for plaintiff in error that a defendant may be prosecuted as aiding and abetting in the commission of the crime, although the crime is of such a nature that personally he cannot be guilty thereof. A familiar illustration is that a woman may be held to answer as aiding and abetting in the crime of rape, although personally she cannot commit this crime herself. All the cases to this effect are collected in a note in 5 A. L. R. 782.

"So, while the plaintiff in error, not being a public officer at the time the embezzlements here were alleged to have been committed, could not have been presented as

a principal, he is nevertheless amenable to prosecution as an aider and abettor."

In Bishop v. State, 118 Ga. 799, 45 S. E. 614, it is said:

"The only point argued in the brief is that one cannot be accessory where he could not have been the principal; that the offense defined in Pen. Code 1895, § 188, can only be committed by officers or employes of a corporation, and, as Bishop was not connected with the bank, it was legally impossible for him to be guilty of embezzlement, or of conspiring, aiding, and abetting Matthews, the president, in secreting, taking, and carrying away the property alleged to have been misappropriated.

"There are many offenses which can only be committed by particular classes of the community—bigamy by married persons; rape, seduction, and bastardy by males; larceny after trust by bailees; embezzlement by officers; and many others set out in the Penal Code of 1895. But because one cannot be a principal, it by no means follows that he cannot be punished as an abettor. One can assist in that which he cannot do. * * *

"While the common-law offense of conspiracy has not been incorporated in the Penal Code of 1895, our books recognize that one may conspire with another to commit a crime. In such instances the crime is that prohibited by the statute, and the conspiracy is referred to as an incident, and one of the means by which the act is accomplished."

Under the evidence, the statute above quoted, and the law as above announced, it follows that the defendant even though he was not such an officer as was contemplated by the statute, yet if he "aided and abetted" one who came within its terms, he was guilty under the law the same as if he was a principal.

Having held in the Spivey Case that as a member of the board of education he was an "executive" officer, we are also of the opinion that he would come within the provisions of the statute "or other public officer." It is contended by defendant that the rule of "ejusden generis" excludes school district officers from the general terms of

the act. By this term it is meant that where a particular class is mentioned, and this is followed by general words, the class first mentioned is to be taken as the most comprehensive and controlling, and that the words last mentioned are governed by those first mentioned; and that they refer to and should be held to mean only what is referred to specially in the first class. This rule has been recognized as a general rule of construction and is supported by authority and reason. But this rule has always been recognized as a guide to the courts in ascertaining the legislative intent. The true intent of what the Legislature meant by the use of the terms used in the statute is the controlling element and the desire of the court to ascertain. The statute under which defendant is charged is a general statute and it covers "every executive, legislative, county, municipal, and judicial officer" within its terms. It then uses the expression, "or other public officer, or any person assuming to act as such officer." These expressions, to our mind, show a clear intent on the part of the Legislature that it was intended to cover every officer in the state by its terms. A school board member is a public official. They are selected for the purpose of conducting and managing the affairs of the school district. Their pay is limited, yet the responsibility of their position places upon them the duty of handling business affairs, which entail the expenditure of large sums of money, and the making of contracts which involve large amounts, as revealed by the evidence in the instant case. Certainly it was not the intention of the Legislature that public officers with the duties and responsibilities of school board members should have been omitted from the terms of the statute, and many other officers with much less duties and responsibilities should be included within its terms. It can not be doubted that the punishment for bribery of a member

of the board of education was as much to be desired by the lawmaking body as the bribery of any other officer.

We have carefully examined the cases of Ex parte Carson, 33 Okla. Cr. 198, 243 P. 260, and Ingram v. State, 51 Okla. Cr. 143, 3 P. 2d 736, cited by defendant, and which it is claimed supports the contention of defendant. A careful reading of these cases, in our opinion, shows a distinction from the instant case. In the Carson Case the statute under consideration was a special statute dealing directly with "the hours of employment of females in certain industries." Oklahoma Statutes 1931, section 10847, O. S. A., title 40, sec. 81. Section 1 of the act specifically named those industries but did not specifically mention "banks." This act was amended by the Legislature in 1919, and there was added thereto the words, "Telegraph or telephone establishment or office." The word "banks" was not added at the time of the amendment of this statute, but the words, "or any other establishment employing any female, more than nine (9) hours in any one day", were added. The court, in that case, properly applied the rule or maximum "ejusdem generis", as applicable to this special statute. The court said [33 Okla. Cr. 198, 243 P. 262]:

"We cannot presume that in naming the various lines of business in which the limitation should apply, the Legislature overlooked including banks, particularly when in 1919 it amended the original by including employees in telegraph establishments and again failed to include banks. Apparently the Legislature was attempting to reach those lines of business that require physical labor, as laundries, bakeries, restaurants, or that operate continuously or for long hours, as hotels and telegraph and telephone establishments, and it took cognizance of the well-known fact that the work done by the employees of a bank is largely mental labor, and the working hours are generally shorter than in other lines of business."

The statute here involved is the general bribery statute. It includes "every executive, legislative, county, municipal, judicial or other public officer." If a member of the board of education is not included within its terms, then there is no penal statute in this state by the terms of which a member of a board of education may be charged with a felony, no matter what amount he may receive as a bribe.

This case and all of the text-books and authorities which announce the doctrine of "ejusdem generis", recognize it as a rule of construction, and that it should not be allowed to defeat the plain legislative intent. This is recognized in 59 Corpus Juris, sec. 581, cited in defendant's brief, when it says:

"The doctrine of ejusdem generis, however, is only a rule of construction to be applied as an aid in ascertaining the legislative intent, and cannot control where the plain purpose and intent of the Legislature would thereby be hindered or defeated."

In the Ingram Case the statute under consideration was a special statute referring specially to "county treasurers, or his deputy", and had reference to fraudulently making out tax receipts, or duplicate tax receipts, with intent to defraud the state, county, or any other person. Oklahoma Statutes 1931, section 12711, O. S. A., title 68, sec. 208. This statute, after naming the treasurer and his deputy, had the expression, "or any other person". In the majority opinion it was held that the doctrine of "ejusdem generis" applied and that defendant not coming within the classification of a treasurer or deputy, he being a tax ferret appointed by the county commissioners, did not come within its terms. It will thus be noted that what has been said in reference to the Carson Case applies with equal force to this case. It may also be noted that in the Ingram Case

the court found that the codefendant of Ingram, who was a deputy county treasurer, was not guilty of any offense under the statute, for the reason that there was no evidence of an intent to defraud the state, Osage county, or anyone else. Not so in this case, the codefendant Spivey was found to be guilty as a principal and his case was affirmed. In the Ingram Case the court, in referring to the "aiding and abetting" by Ingram, said [51 Okla. Cr. 143, 3 P. 2d 741]:

"While under our statute it is not necessary that Streetman be convicted or even tried in order to convict Ingram, * * * the evidence must have been sufficient to warrant a conviction against Streetman, his codefendant."

In the case of Sheely v. People, 54 Colo. 136, 129 P. 201, 202, which was referred to in the Spivey Case and quoted from, the court, in considering the rule of "ejusdem generis", says:

"To determine the question presented, it is necessary, as it is in the case of any statute, to ascertain the intention of the Legislature in enacting the law. For this purpose, such rules of construction as are favored by the courts and that may aid in reaching a correct determination may be employed.

"At the same time it must be remembered that this is a criminal statute, and should be strictly construed as against the state and liberally in favor of the accused, but the strictness to be employed or the liberality to be indulged must not be such as will confine the operation of the statute within limits narrower than those intended by the Legislature or destroy the intention of the lawmaking body. Counsel for plaintiff in error have called to our attention certain well-known rules of statutory construction, and insist that they should be applied to determine the intention of the Legislature with respect to the statute in question. They are the rules of ejusdem generis. noscitur a sociis, and expressio unius est exclusio alterius. We

have no quarrel with these rules, nor the authorities cited with respect to them. They can be used only to aid the courts in ascertaining the legislative intent; and, when they are to be used for that purpose, they, of course, must be applicable and afford aid. If they do not afford any aid, they are not to be resorted to. * * *

"It is plain from the statement of these rules that, before they can be of any aid, it must clearly appear that the Legislature was thinking of a particular class of persons or objects. Now, it does not appear that the Legislature had in mind any particular class of officers when we read the section under consideration. The words are, 'any judge, justice of the peace, sheriff, coroner, clerk, constable, jailer, attorney general or prosecuting attorney, mayor, alderman or member of city council, member of the legislative assembly, or other officer, ministerial or judicial.' Here are enumerated executive, legislative and judicial officers; state, county, and municipal officers; some that possess ministerial qualities in varying degrees; some that are alone in their office; others that are members of official bodies. It cannot be said that those mentioned are all of one particular class, so as to make the general words referable to a class. The other rule, that the mention of one thing is the exclusion of the other, is equally inapplicable. Specific enumeration of the officers mentioned does not exclude county commissioners if the general words that follow will fairly include them. It follows that these maxims or rules are not aids in the construction of this statute. If the statute relates to a county commissioner, it must be because that officer is fairly included in the words, 'or other officer, ministerial or judicial.' In the general scope of their duties commissioners are not judicial officers. * * *

"So we come to the real question in the case. Did the Legislature intend to cover county commissioners by including them within the designation of other ministerial officers? A primary rule of construction is that the intention of the Legislature is to be found in the ordinary meaning of the words of a statute in the connection in which

they are used and in the light of the mischief to be rendered. While there is a rule requiring the strict construction of a penal statute, that rule is not violated by giving to the words their full meaning in the connection in which they are employed. Woodworth v. State, 26 Ohio St. 196. The mischief sought to be remedied by the statute is the bribery of public officers. Every one must admit that it is just as necessary to prevent the bribery of a county commissioner as that of any other official, and that the bribery of a county commissioner is as much within the mischief sought to be remedied by this statute as the liberty of any other officer."

This reasoning applies to the case at bar. There can be no question but that it was the clear intention of the Legislature to include such officers as members of a board of education within its terms. State v. Loechner, 65 Neb. 814, 91 N. W. 874, 59 L. R. A. 915.

It was contended in the original brief filed in the Spivey Case No. A-9642, that the codefendants, Spivey and Price, should have been charged under chapter 32, article 2, Session Laws of 1931, O. S. A., title 21, sections 392-395. At the time of the oral argument counsel for defendant abandoned this contention, but now contends that if defendant violated any law at all he violated section 2469, Okla. Stats. 1931, O. S. A., title 21, sec. 269, which provides:

"Every executive officer who asks or receives any emolument, gratuity or reward, * * * excepting such as may be authorized by law, for doing any official act, is guilty of a misdemeanor."

It is contended by the state that this section of the statute was repealed, and as authority for this statement cite the case of Petitti v. State, 7 Okla. Cr. 12, 121 P. 278. Counsel for defendant contend that this case does not hold that the section above quoted has been repealed, and as an argument for this contention cite the case of State v.

Sowards, 64 Okla. Cr. 430, 82 P. 2d 324, in which this court held that the defendant, Sowards, was rightfully charged under this section of the statute.

From a careful consideration of the statutes and an examination of the history of each, we are of the opinion that the county attorney properly charged the defendant under section 1907, Okla. Stats. 1931, O. S. A., title 21, sec. 382. This is the general bribery statute of this state, and the facts in the instant case justified the filing under that statute. If the county attorney had the discretion to file charges under either of the two sections, the grand jury had the right to indict the defendant under either section.

Special statutes may be enacted by the Legislature dealing with certain classes of crime. This has often been done by the Legislature of this state. Session Laws 1937, p. 309, §§ 97, 98, O. S. A., title 6, sects. 257, 258; Okla. Stats. 1931, sec. 2495, O. S. A., title 21, sec. 341; Okla. Stats. 1931, sec. 1774, O. S. A., title 21, sec. 23; Okla. Stats. 1931, sec. 2552, O. S. A., title 21, sec. 800, and many others not here cited.

The county attorney has a discretion to proceed under these special statutes or under the general statutes. This rule has often been followed by this court in construing two or more statutes covering the same offense. State v. Bunch, 23 Okla. Cr. 388, 214 P. 1093; Bingham v. State, 44 Okla. Cr. 258, 280 P. 636; Olney v. State, 51 Okla. Cr. 309, 1 P. 2d 799.

We have heretofore held in the Spivey Case that the witnesses, Estes, Smith and Watts, were accomplices of the codefendant Spivey. This is also true as to the defendant Wilkins. Under the law and the former decisions of this court these witnesses had to be corroborated, and

they could not corroborate each other. Yeargain v. State, 57 Okla. Cr. 136, 45 P. 2d 1113, and Luna v. State, 62 Okla. Cr. 435, 71 P. 2d 1101.

We also found from the evidence in that case that there was independent testimony which corroborated these witnesses to that extent required by the law of this state and the decisions of this court.

The question now arises, Is there evidence in this case sufficient to corroborate these witnesses so as to bring them within the rule heretofore announced in the Spivey Case? Many of the witnesses used in the Spivey Case were used in the instant case. All of the record evidence, and the proceedings of the board of education were introduced in both cases.

The witnesses, E. C. Clay, J. Lane Wilson, Dan R. Cummings, Martin Cummings, M. O. Melveney, R. L. Scott, and William Gill, were placed on the stand in the Spivey Case but not in the Wilkins Case.

In the instant case the testimony of the witness Roy M. Smith was corroborated by Earl P. Johnson, exchange collector and teller of the Fidelity National Bank. He testified that Roy M. Smith had on September 14th, 1936, secured from his bank a cashier's check for $6,000 payable to the board of education of Oklahoma City. That on the morning of the 17th of September, 1936, Mr. Smith phoned him it would be necessary to secure this money in bills of small denomination. That in a few minutes he appeared at the window with a black brief case, and cashed the $6,000 cashier's check and left the brief case for him to place the bills therein. He also cashed a check for $500 which he requested to be placed in bills in a separate package. Mr. Smith returned in a short while and took

the brief case with the $6,000 in small bills which he had prepared, and also the $500. This evidence is identical with the testimony of the witness Roy M. Smith and Leroy Estes.

Harold Dotson testified that he was an attorney and had offices with the defendant Frank Wilkins, and that on the morning of September 17, 1936, he was called to the office of Frank Wilkins, and there was present Roy M. Smith, Leroy Estes and the defendant. He was given a deed with the request that he go to the home of J. G. Stearley, the clerk-business manager of the board of education, and have the same attested. They then proceeded to the office of the board of education where they had the seal attached thereto, and the deed was taken by him and Mr. Smith, whom he accompanied to the courthouse where it was recorded. He did not recall seeing Mr. Rose or Mr. Price, members of the board, at Mr. Wilkins' office on that morning, but he saw Mr. Estes, and saw him with the black brief case and he had it when they left to get the deed signed. This evidence was the same as given by the witnesses, Smith and Estes.

Vernon L. Downing testified that in April, 1936, he, on one occasion, paid to the defendant $400 in cash in his office, and $400 again in June, 1936. These payments were made at the request of defendant, as he stated, for four members of the board of education and not for himself personally. They were made for the purpose of securing the payment of accounts for abstract work which he had done for the board of education. This evidence does not corroborate the witnesses whom we have held were accomplices, but together with other evidence it shows a plan or scheme used for the purpose of securing money for certain members of the board of education.

The evidence of Wm. M. Eckroat was to the same effect, although of a separate transaction.

It was admissible as was held in the Spivey Case and the Capshaw Case, decided on the 19th day of June 1940, 69 Okla. Cr. 440, 104 P. 2d 282.

The testimony of Otto Rose as being present at the office of defendant and signing the deed, as stated by the witnesses, Smith and Estes; the party at the Biltmore Hotel after the sale of the property. This party was arranged by Smith and Estes. The defendant and his codefendant Spivey were present. There is evidence that on one occasion the codefendant Spivey said let him pay for the liquor, he had $1,000 of his (Smith's) money. The records of the hotel show that Estes registered under an assumed name. It also revealed that Spivey was registered and had rooms there on that date.

The evidence of the defendant himself, in many ways, corroborated the evidence of the witnesses here held to be accomplices. His admission of their presence at his office on the day the school royalty was closed. The conversations that were had. His evidence in reference to his being called from the ball game and meeting several of these witnesses at his home. His attendance at the party at the Biltmore Hotel, and his several automobile rides with them at different times prior to the convening of the grand jury, was all proper evidence for the jury to consider as corroborating the evidence of the accomplices. It is true that he denied having received the $6,000 at his office, as related by the witness, Estes, but this was a question for the jury to decide under all of the evidence, both direct and circumstantial. We have often held that the fact as to whether there is sufficient evidence to corroborate an accomplice is a question for the jury, and that each individual case rests upon its own facts to determine that question. Huf-

ford v. State, 61 Okla. Cr. 141, 66 P. 2d 529; Fitzgerald v. State, 65 Okla. Cr. 1, 83 P. 2d 581; Howerton v. State, 65 Okla. Cr. 457, 88 P. 2d 904.

In addition to the evidence heretofore cited there was introduced by the state the proceedings of the board of education with reference to the sale of the oil royalties belonging to the school district. Without going into detail we will state that these minutes and proceedings in many ways corroborate the statements and evidence of the witnesses, Smith and Estes. They especially reveal that the actions, motions and votes of the codefendant Spivey were in perfect accord with the agreements and understandings of the parties with reference to the sale of the Northeast high school royalties.

It is provided by Oklahoma Statutes 1931, sec. 3071, Okla. St. Ann. title 22, sec. 742, as follows:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

This statute has been construed by this court on many occasions. Some of the late cases in which it was considered are: Hufford v. State, 61 Okla. Cr. 141, 66 P. 2d 529; McNack v. State, 62 Okla. Cr. 285, 71 P. 2d 317; Luna v. State, 62 Okla. Cr. 435, 71 P. 2d 1101; Johnson v. State, 62 Okla. Cr. 386, 71 P. 2d 786; Teague v. State, 64 Okla. Cr. 369, 81 P. 2d 331; Brewer v. State, 63 Okla. Cr. 389, 75 P. 2d 901; Fitzgerald v. State, 65 Okla. Cr. 1, 83 P. 2d 581; Rice v. State, 60 Okla. Cr. 398, 64 P. 2d 1240.

In the Hufford Case we announced the rule that had been followed by this court, as follows [61 Okla. Cr. 141, 66 P. 2d 532]:

"It is not essential that the corroborating evidence shall cover every material point testified to by the accomplice, or be sufficient alone to warrant a verdict of guilty. If the accomplice is corroborated as to some material fact or facts by independent evidence tending to connect the defendant with the commission of the crime, the jury may from that infer that he speaks the truth as to all. Such corroborating evidence, however, must show more than the mere commission of the offense or the circumstances thereof."

Also in the Howerton Case, after citing the cases that have held the evidence sufficient and insufficient to corroborate the accomplice, we say [88 P. 2d 905] :

"From these different cases it may be determined that in accordance with certain general well defined propositions of law stated in the different opinions, that each case stands or falls on the particular testimony of that case."

From a careful consideration of the facts in this case we find there is sufficient corroborating evidence of the witnesses, Watts, Estes and Smith.

It is urged by defendant that the court erred in refusing to give certain requested instructions, and by the giving of instruction No. 9. This instruction is quoted in full in the Spivey Case, and it is, therefore, unnecessary to quote it here. Nor is it necessary to quote the requested instructions. These requested instructions were a request for the court to charge the jury that the witnesses, Watts, Estes and Smith, were accomplices, and that defendant could not be convicted upon their uncorroborated evidence, and that under the law they could not corroborate each other. And also a request, as to the application of the evidence in determining whether the witnesses had been corroborated. Under the general instructions given by the court each of these questions was given to the jury as requested by defendant. He cannot complain unless in-

struction No. 9 was erroneous, and deprived him of those rights which we have heretofore held he was entitled to under the law. Instruction No. 9 was based upon Oklahoma Statutes 1931, sec. 1916, Okla. St. Ann., title 21, sec. 391, which provides:

"In all cases wherein the offering, giving or receiving bribes is made criminal by the provisions of the penal code, the party to such crime who shall first furnish information in relation thereto, as against the other parties, and in any prosecution therefor, shall testify to the same truthfully and fully, shall not thereafter be criminally liable therefor, but in such case no conviction shall be had on the uncorroborated testimony of one such witness." Handley v. State, 69 Okla. Cr. 321, 102 P. 2d 947.

This instruction first covers section 1907, Okla. Stats. 1931, O. S. A., title 21, sec. 382, and in referring to the above-quoted section uses the exact terms of the statute, "but in such case, no conviction shall be had on the uncorroborated testimony of one such witness." We believe it would have been better for the court in instructing the jury to have left out the word, "one", and instructed the jury, "on the uncorroborated testimony of such witnesses." However, in view of the fact that there was sufficient corroborative evidence, independent of the testimony of either of the accomplices, as has heretofore been pointed out, we do not think defendant was prejudiced by the giving of this instruction. The court stated that the witnesses were accomplices, and that they had to be corroborated. He did not leave it to the determination of the jury as we have held in a number of cases where the evidence was conflicting, as he had a right to do. McKinney v. State, 20 Okla. Cr. 134, 201 P. 673; Burleson v. State, 27 Okla. Cr. 443, 228 P. 609; Sipes v. State, 36 Okla. Cr. 1, 251 P. 511.

This instruction so far as the defendant is concerned must be considered in connection with all the instructions,

and especially with reference to instruction No. 10. In this instruction the court instructed the jury upon the question of "aiding and abetting his codefendants, Ed W. Spivey and R. H. Price", and required them to find beyond a reasonable doubt that he had so aided and abetted before they could return a verdict of guilty against the defendant.

It has often been held by this court that:

"Instructions must always be considered with the evidence in the case, and where they contain no fundamental error or any misstatement of the law which in the light of the evidence was calculated to mislead the jury to the injury of the defendant, and where the evidence clearly shows that the defendant is guilty, a conviction will not be reversed because the charge of the court may not be technically correct." Ostendorf v. State, 8 Okla. Cr. 360, 128 P. 143, 144; Brown v. State, 9 Okla. Cr. 382, 132 P. 359; West v. State, 13 Okla. Cr. 312, 164 P. 327, L. R. A. 1917E, 1129; Greenwood v. State, 51 Okla. Cr. 74, 299 P. 248.

The fourth proposition urged by defendant for a reversal of this case was that the court erred in refusing to set aside the indictment because the evidence was insufficient to sustain the same. This proposition has been considered and disposed of in the Spivey Case.

The defendant in this case is a member of the bar of this state. His case has been given careful and painstaking care by this court. His conviction not only deprives him of his liberty, but also of the right to practice his chosen profession, and the right to hold public office in this state. He has been ably defended. This case has been ably briefed and presented both by the state and by the defendant. The defendant, in his own behalf, has filed an elaborate brief which has been duly considered.

Finding no error it is the order of this court that the judgment and sentence of the district court of Oklahoma county be affirmed, and it is so ordered.

DOYLE, P. J., and JONES, J., concur.