Roy Lee DAVIS, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12277.

Criminal Court of Appeals of Oklahoma.

May 23, 1956.

Rehearing Denied Sept. 5, 1956.

1002

Coffey & Coffey, Tulsa, Dean L. Nichols, Sand Springs, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Roy Lee Davis, plaintiff in error, hereinafter referred to as defendant, was charged by information filed in the district court of Tulsa County with the crime of assault with intent to kill; was tried before a jury, convicted and his punishment fixed at ten years confinement in the State penitentiary. Appeal has been perfected to this court.

Some six propositions of error are argued in the briefs, and will be treated in the order presented.

At this point a brief summary of the record and evidence is in order.

On October 2, 1953 District Judge W. Lee Johnson entered an order committing defendant for mental observation to the Eastern Oklahoma Hospital at Vinita for a period of thirty days, or until such time as the mental examination could be completed. The parties concede that based on observations made, Dr. Adams, Superintendent of the Hospital in question, did not believe defendant insane, and returned him to stand trial.

On December 15, 1953 defendant's case was called for trial. The record shows that on the same day there was filed for defendant a "Special plea and motion for trial pursuant to Section 1161, Title 22, Oklahoma Statutes Annotated". The pertinent grounds will be set out hereinafter. Suffice to say, by reason of the wording of the motion, a doubt arose in the mind of the court as to defendant's then "present sanity".

Under such situation, in a special proceeding under 22 O.S.1951 § 1162, Judge Eben L. Taylor, to whose court the case had been assigned for trial, ordered a jury empaneled to determine the defendant's present sanity, limited to a determination of whether the accused was mentally competent to make a rational defense. The court apparently was aware of the holding of this court concerning a situation where doubt would arise in the mind of the court regarding the sanity of accused, as set out in Bingham v. State, 82 Okl.Cr. 5, 165 P.2d 646. And see Wallin v. State, 84 Okl.Cr. 194, 182 P.2d 788; Weiland v. State, 58 Okl.Cr. 108, 50 P.2d 741. The jury found the defendant "insane at this time", and accordingly he was on December 17, 1953 recommitted to the Eastern State Hospital at Vinita.

Thereafter on May 27, 1955, the case was again set for trial and for June 8, 1955, but it actually came on for hearing on June 14, 1955, and at that time counsel for the State announced ready and defendant's counsel announced, "The defendant will be ready". At the conclusion of the opening statement by the assistant county attorney counsel for defendant interposed objection to the introduction of evidence on the ground, principally, that there had been no judicial determination of the present sanity of the defendant. The record does not reflect whether or not any evidence was heard in support of the objection.

Concerning the evidence, the State offered proof that defendant and the prosecuting witness, Mary Francis Davis, were husband and wife; that they were estranged and were living separate and apart on August 13, 1953 when the assault took place. Three daughters, ages 10, 11 and 14 years, were at the time residing with their mother, but the older girl was not at home on the day in question. Early in the morning defendant went to the home of his wife's parents who lived next door to where his family resided, and called his wife and two daughters home. He then went with the two girls to an old creek bed about 500 yards away from the house, picked up some scrap iron and junk and carried it home and piled it back of a smoke house.

One of the girls, Peggy, went to the store for a soft drink in exchange for some bottles she had and three pennies her father gave her. Defendant sent the other girl, Billie Jean, to a neighbor's for a hack saw to cut up a piece of scrap iron. While the two girls were away from the premises, defendant went into the house where it appears his wife was sitting at a sewing machine, and with a claw hammer assaulted her and beat her about the head, rendering her unconscious and seriously injuring her. Before she became unconscious she had screamed. When found she still had grasped in her hand some of her sewing.

Peggy Charlene Davis testified that as she rode her bicycle back from the grocery store she heard her mother screaming. That she hurried to her home, dropped her bicycle and rushed in the house; that her mother was lying on the floor and her daddy was bending over her and she saw him strike her mother twice with a claw hammer. The daughter said that when she saw this she screamed and her father, the defendant, turned around and started after her, and she ran next door to the home of her grandparents, went into the house and phoned for an ambulance.

Billie Jean, one of the daughters, had heard the screams of her sister Peggy and rushed into the house and found her mother on the floor with blood coming out of her head. Billie Jean then went out and called to her grandparents who lived next door. Her father told her to "call the law".

Defendant offered proof that he was an ex-service man, but he had no hospital record while in the service. After being discharged it was developed that he had been seized with fits of violence. He was also addicted to the use of alcohol. He was eventually, by some Legion friends, taken over to a Government hospital at Little Rock, Arkansas for physical and neuropsychiatric examination where his case was diagnosed as one of acute, severe, depressive reaction under external precipitating

stress of unemployment and separation from his family; a premorbid personality and predisposition by reason of low average intelligence, whose estimated resultant incapacity was minimal at the time. Because he was then (July 7, 1949) believed competent, the patient was discharged for the assigned reason that he had received the maximum hospital benefit. He had been in the hospital less than thirty days.

On rebuttal the State called four lay witnesses who testified that in their opinion defendant was sane at the time he assaulted his wife. Dr. Felix Adams gave as his expert opinion that the defendant was sane at the time of the commission of the crime charged.

In the first proposition it is urged that the information is insufficient in law to charge a public offense under 21 O.S. 1951 § 652, and at most charges an assault with intent to kill, pursuant to section 653.

The pertinent portion of the information will be detailed hereinafter.

We have noted that the crime set out in the information is charged to have taken place on August 13, 1953, so that this was before the statute forming the basis for the crime charged, 21 O.S.1951 § 652, was amended by S.L.1955, p. 186, § 1. 21 O.S. 1951 § 652 reads:

> "Every person who intentionally and wrongfully shoots, shoots at, or attempts to shoot at another, with any kind of firearm, airgun or other means whatever, with intent to kill any person, or who commits any assault and battery upon another by means of any deadly weapon, or by such other means or force as is likely to produce death * * * is punishable by imprisonment in the penitentiary not exceeding ten years."

Counsel say: "Attempt is made to charge the offense in the words of the statute, but without more by way of a statement of the acts constituting the offense being contained in the information, it is not possible to know under which of the foregoing sections of the statute (Sections 652 or 653)

the charge is brought". Concededly the information is not a model. But is it sufficient?

Section 652, supra, sets out four different means by which the crime defined may be committed: First, by shooting or attempting to shoot at another; second, by assault and battery by means of a deadly weapon; third, *by assault and battery by means other than a deadly weapon, but by such force as is likely to produce death;* fourth, by assault and battery in resisting the execution of any legal process.

It is apparent that the State was attempting to charge the defendant under the third provision of the statute. The means was by other than a deadly weapon, but by force likely to produce death.

By Section 409 of Title 22, O.S.1951, it is provided that the indictment or information is sufficient if it can be understood therefrom: "* * * 6. That the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended." Section 402 of the same Title provides: "The indictment or information must be direct and certain as it regards: 1. The party charged. 2. The offense charged. 3. The particular circumstances of the offense charged, when they are necessary to constitute a complete offense."

It is noted herein that the information charged:

> "That Roy Lee Davis * * * did unlawfully, wilfully, intentionally, wrongfully, and feloniously commit an assault with intent to kill upon the person of another, Mary Francis Davis. * * *"

The information then proceeds to set out specifically the details of the assault, specifying the means and manner in the following language:

> "by then and there beating the said Mary Francis Davis upon and about the head and face with such force and violence as was likely to produce death,

with a claw-hammer which he, the said defendant, then and there had and held in his hands, with the unlawful and felonious intent then and there upon the said part of said defendant to kill the said Mary Francis Davis * * *."

The attorney general argues that a deadly weapon is one likely to produce death, and says that a claw hammer is such, citing People v. Van Every, 133 Cal.App. 354, 24 P.2d 217, and defendant contends to the contrary. However, by reason of the view that we take, we think the words of Judge Matson in Gober v. State, 25 Okl.Cr. 145, 149, 219 P. 173, 174, applicable where he said, in a comparable situation:

"It is immaterial under the statute whether or not a deadly or dangerous weapon is used provided, of course, that the force used is likely to produce death and the intent of the defendant at the time is to kill. It then becomes a question of fact for the jury to determine whether or not the force used is such as is likely to produce death, and whether or not the defendant intends to kill by the use of such force."

See also Jones v. State, 46 Okl.Cr. 187, 287 P. 1073.

We therefore conclude the information sufficient to withstand the demurrer interposed.

The next proposition urged is that "The State has prosecuted and the jury has found an insane man guilty."

From the facts that we have already recited, it has been noted that when defendant's case was called for trial on June 14, 1955, both the State and the defense announced ready for trial, and it was not suggested by counsel for the defendant that his client was not presently and actually sane, as provided by 22 O.S.1951 §§ 1162 to 1169. It is noted that after the jury had been sworn to try the case and after the opening statement had been made for the State, counsel for the defendant interposed an objection to the introduction of evidence, and in part stated:

"And the further objection to the introduction of the evidence or further proceedings in this trial on the ground and for the reason that there has been no judicial determination of the present sanity of the defendant."

On the court overruling counsel's objections, he proceeded immediately to make his opening statement, and in part said:

"The only issue that the defendant will lay before this jury involves the question as to whether or not at the time in question and under the circumstances that counsel has related this defendant was sane or insane. It is the position of the defense, as the county attorney has told you, that Roy Lee Davis at the time and on the occasion in question was temporarily insane. * * *"

The trial court, of course, was aware of the particular matters with reference to defendant's sanity that preceded this trial, and that we have hereinabove recited. It seems to be counsel's thesis that after the trial in December, 1953, as to the present sanity of the defendant and the verdict of the jury finding him then presently insane, he could not be tried until there had been in some way provided by law a formal determination of his restoration to sanity.

Tit. 22 O.S.1951 §§ 1161–1169, with minor changes were in force and effect in the Territory prior to statehood and were adopted from Dakota Territory at a time when neither that territory nor Oklahoma Territory had any institutions for the care of the insane.

Sections 1162, 1167 and 1169 provide, respectively:

"1162. When an indictment or information is called for trial, or upon conviction the defendant is brought up for judgment, if a doubt arise as to the sanity of the defendant, the court must order a jury to be impaneled from the jurors summoned and returned for the term, or who may be summoned by direction of the court, to inquire into the facts."

"1167. If the jury find the defendant is insane, the trial or judgment must be suspended until he becomes sane, and the court, if it deems his discharge dangerous to the public peace or safety, may order that he be, in the meantime, committed to the care of the sheriff until he become sane."

"1169. When the defendant becomes sane the sheriff must thereupon, without delay, place him in the proper custody until he be brought to trial or judgment, as the case may be, or be legally discharged."

22 O.S.1951 § 925 provides:

"When it is contended on behalf of the defendant in any criminal prosecution that he is at the time of the trial a lunatic, or insane person, or a person of unsound mind, the court shall submit to the jury a proper form of verdict, and if the jury finds the defendant not guilty on account of such lunacy, insanity or unsoundness of mind, they shall so state in their verdict, and the court shall thereupon order the defendant committed to the state hospital for the insane, or other state institution provided for the care and treatment of cases such as the one before the court, until the sanity and soundness of mind of the defendant be judicially determined, and he be discharged from said institution according to law."

In commencing an analysis of the statutory provisions quoted, as well as certain provisions of Title 35, formerly entitled "Insane and Feeble Minded Persons", but which has now been redesignated and reallocated as Title 43A, Mental Health (in conformity to the Mental Health Law of 1949) and amendments thereto, in so far only as the various provisions may affect the proposition here raised, we would keep in mind that it has been uniformly held that the fundamental rule of construction is to ascertain and give effect to the intention of the legislature as expressed in the statute. Appeal of Price, 88 Okl. 156, 212 P. 424; Wilkins v. State, 70 Okl.Cr. 1, 104 P.2d 289; 50 Am.Jur., (statutes) § 223. Also it should be remembered that where literal enforcement would result in great inconvenience or absurd results which the legislature probably did not contemplate, the court must presume that such consequences were not intended, and adopt a construction that is reasonable and will avoid the absurdity, In re Ambler, 11 Okl.Cr. 449, 148 P. 1061; Brown v. State Election Board, 197 Okl. 169, 170 P.2d 200; City of Tahlequah ex rel. Johnston v. Franklin, 201 Okl. 36, 200 P.2d 417. The general design and purpose should be kept in mind in construing the statute. The Darby-Lynde Co. v. Alexander, 10 Cir., 51 F.2d 56, certiorari denied 284 U.S. 666, 52 S.Ct. 40, 76 L.Ed. 564.

There is also the further rule that where two statutes cover the whole or in part the same matter and are not absolutely irreconcilable, the court must, if possible, give effect to both in so far as they are not irreconcilable, in absence of purpose to repeal being clearly expressed or indicated. Johnson v. City of Vinita, 172 Okl. 376, 45 P.2d 1089.

Section 1162 was early construed by this court in Marshall v. Territory, 2 Okl.Cr. 136, 145, 101 P. 139, 142. After citing a long line of cases, the court in the body of the opinion quoted from such studies, and with approval, the following statement:

" 'That all books, treaties, and decisions on the subject show that the true and only reason why an insane person should not be tried is that he is disabled by the act of God to make a just defense if he has one. * * * If, therefore, a person arraigned for a crime is capable of understanding the nature and object of the proceeding against him, if he rightfully comprehends his own conduct in reference to such proceeding, and can conduct his defense in a rational manner, he is, for all purposes of being tried, to be deemed sane, although on some other subjects his mind may be deranged or unsound.' "

In paragraph 2 of the syllabus in the Marshall case, the court stated:

"The inquiry to be submitted to a jury, in a proceeding under section 5661, Wilson's Rev. & Ann.Stat., Okla. 1903 [22 O.S.1951 § 1162] is: Whether the accused is mentally competent to make a rational defense, and it is not whether he is able to distinguish between right and wrong."

See also the later cases of Bingham v. State, supra, and Wallin v. State, supra.

Where the present sanity of an accused is not raised and he goes to trial, and a defense is interposed setting out a plea of not guilty by reason of defendant being insane at the time of the commission of the act charged, then the requisite insanity is an inability to distinguish right from wrong, and to understand the nature and consequences of the act. Roe v. State, 17 Okl. Cr. 587, 191 P. 1048; Gallagher v. State, 81 Okl.Cr. 15, 159 P.2d 562; Whisenhunt v. State, Okl.Cr., 279 P.2d 366.

It is at once apparent that the above definitions are materially different from the definition in Section 3(c), Title 43A, O.S.A. wherein it is said that " 'Mentally ill person' means any person afflicted with a mental illness to such an extent that he is incapable of managing himself and his affairs, * * *". But it is not contended in this case that the above definition supersedes the legal definition of this and other courts set out, and it would not appear that it was ever the intention of the legislature that such should be.

In the within case, as we have set out in the history already recited, on December 15, 1953 when the case was called for trial the first time, defendant at one moment insisted on an immediate trial, and at another moment claimed as a defense that he was "(2) Not guilty by reason of the fact that defendant is a person of unsound mind and that at the time he is alleged to have committed the act charged, he was temporarily deprived of reason and therefore incapable of knowing its wrongfulness."

The court under the situation confronting it decided to proceed under the provisions of 22 O.S.1951 § 1162 heretofore quoted, and have the jury determine the "present sanity" of the defendant, which as we have shown by authorities cited, was for the purpose of determining whether the accused was mentally competent to make a rational defense. His attorneys apparently thought so by demanding trial, but the court was of the opinion, and correctly so, that counsel could not waive the right of the accused if accused was in fact insane, as the wording of the motion would make it appear. Signs v. State, 35 Okl.Cr. 340, 250 P. 938.

We have seen that the jury found the defendant "presently insane." So that the court proceeded under authority of 22 O.S. 1951 § 1167 and ordered defendant delivered to the custody of the sheriff of Tulsa County. But in accordance with the recognized practice since the Territory and later the State has had mental institutions where insane persons might be received and treated, the order provided that the sheriff should deliver the defendant to the Eastern Oklahoma State Hospital at Vinita. The sheriff's return shows that defendant was received at that Institution on December 17, 1953.

The legislature in 1953 at time of amending the Mental Health Laws adopted this practice, and specifically granted authority to courts prior to the determination by a jury as provided in Section 1162 above, of the insanity of an accused, to order him to a state hospital for observation for a period of not to exceed ninety days. 43A, S.L. 1953, § 60. By the 1955 amendment, 43A O.S.Supp. 1955 § 60 the authority is limited to "a court of record having jurisdiction of the criminal proceedings".

As we have seen, 22 O.S.1951 § 1169 simply provides that "When defendant becomes sane [that is, mentally competent to make a rational defense] the sheriff must thereupon, without delay, place him in the proper custody until he be brought to trial

or judgment, as the case may be, or be legally discharged." Presumably in this case the trial court was cognizant of defendant's history, and of his medical treatment, at the Eastern State Hospital, where he had been sent and from which Institution he had been delivered back to the Sheriff of Tulsa County, and that the information coming to his attention failed to cause a doubt to arise in his mind as to the present sanity of the defendant at time of such redelivery from the hospital and at time of trial in June, 1955. This presumption is fortified by the testimony of Dr. Felix Adams, Superintendent of that institution, who testified at the trial as to defendant's claimed temporary insanity at the time of the commission of the crime charged as happening on August 13, 1953. He testified that he first saw defendant on October 5, 1953 and had conducted psychiatric tests; that defendant had an I.Q. on the first test of 95, and on the next of 93, and that this would not put him in a mentally defective class at all; that he would have to go down into the 70's or 80's or the lows of 50's and 60's to be classed as mentally defective; that the patient (defendant) was returned to the court (sheriff) on November 9, 1953 and re-admitted to his hospital on December 17, 1953.

There was received in evidence a report from the Veteran's Administration Hospital at North Little Rock, Arkansas, showing that the defendant had been admitted to that Institution June 25, 1949 and discharged July 7, 1949, the patient being diagnosed as "competent" and as having received the maximum hospital benefit. This report was received in evidence after counsel for the defendant had made inquiries of witness concerning its contents.

Dr. Adams was asked this question: "Doctor, based upon not only the psychological tests that were given this defendant, but based further upon your observation of him, your conversations with him, and based upon the report you had from the Veterans' Administration's Hospital at Little Rock, and the reports you received from Dr. Martin [of his staff] do you have an opinion as to whether or not the defendant in this case, Roy Lee Davis, was insane or sane on the 13th day of August, 1953?" Witness answered in the affirmative, and over the objections of defendant, stated that "I think he was sane."

Neither Dr. Adams or any other witness was asked on direct or cross-examination concerning the defendant's "present" insanity, as no question had been raised as to that. The court observed the defendant during the trial, had opportunity to notice whether or not he was cooperating with his counsel in his defense, by conferences, etc., and the court heard the defendant testify, and from such observation and the court's knowledge of the history of the case and the evidence of witnesses at the trial, nothing is presented by way of facts to compel the conclusion that the court abused his discretion in failing to have formulated in his mind a doubt as to the defendant's "present" sanity and his mental capacity to make a rational defense. The question was never raised, so that judgment was entered as heretofore recited.

But defendant argues in his original brief and reply brief that 22 O.S.1951 § 925 heretofore quoted, should have governed in this case. Counsel say: "The prosecuting attorney, as the moving party, should have petitioned 'the court or judge thereof which made such adjudication (that defendant is insane) for a finding and order declaring such person restored to soundness of mind' before undertaking to cause defendant to stand trial."

It requires only a reading of 22 O.S.1951 § 925 to discover that it could not apply to this case, if it was still in force and effect, which we do not here decide, for the simple reason that by its own wording it was to apply where the jury would find the defendant not guilty on account of lunacy, insanity or unsoundness of mind at the time of the commission of the act charged.

Counsel then argue that the mental health laws require judicial proceedings for declaration of restoration to soundness of

mind and that 43A O.S.1951, Supp.1955 § 75 provides for such procedure. Also, that there is a further provision by section 76 of the title for a determination of soundness of mind by board of psychiatric examiners. It is argued: "Technically, it may be urged against us, and, strictly speaking, we think it largely true that the foregoing statutes relate to guardianship matters in probate court, but it is no distortion of language to point out here that all doubt of defendant's present sanity could have been removed in advance of trial, by the simple expedient of following the procedure outlined above, or, at least, to have petitioned a court of competent jurisdiction to say whether defendant was, at the time of trial, able to proceed with his defense."

As pointed out by counsel for the State, it is a sound rule of statutory construction that statutes must be interpreted in the light of the context. McCaffrey, Statutory Construction (1953) p. 57, Central Book Co., N.Y., 1 Bl.Comm. 60. Sections 75 and 76 referred to by defendant must be construed in connection with Section 74, immediately preceding, as well as other sections of the title. Section 74 provides:

"A patient who has been adjudged mentally incompetent and admitted to an institution for mentally ill persons, in accordance with Section 55 or any other Section of this Title may not be discharged (as recovered) until he shall be determined to be of sound mind by an adjudication and court order or by a finding by the Board of Psychiatric Examiners."

Section 75 provides the procedure for a judicial declaration of restoration, and Section 76 provides the procedure for determination by a board of psychiatric examiners. It is noted that all three sections relate only to those persons who have been "adjudged mentally incompetent", within the provisions of the Act, 43A, Mental Health Law.

The State points out that Section 64 very clearly and definitely expresses the meaning of the term. It provides:

"No person admitted to any institution in the Department shall be considered legally mentally incompetent except those admitted in accordance with the provisions of Sections 55 and 58 of this Title, and those admitted under Section 59 of this Title who have been declared legally mentally incompetent elsewhere."

It will be seen by reference that Section 55 outlines the procedure for admission of the mentally ill or mentally retarded by petition in county court by the father, mother or other person named in said section. Section 58 provides for the admission of the mentally incompetent by the superintendent of the institution upon the petition of the guardian of such person. Section 53 provides for the admission of voluntary patients. Section 57 provides for admission of certain mentally retarded persons upon the application of the father or mother or certain other persons. Sections 61 provides for transfer to the institution of prisoners held in penal or correctional institutions. From a reading of Section 74, 75 and 76 it will be seen that such sections have no application to any such persons.

It is particularly noticed that expressly excluded from admission pursuant to the provisions of these various sections are all persons who have criminal charges pending against them, or are in confinement on a criminal charge, Section 51, but the legislature, as we have already pointed out, apparently having no intention or desire of interfering with the criminal statutes and their application, incorporated into the act section 60, that a court can, without a jury, and after hearing, In re Lutker, Okl.Cr., 274 P.2d 786; Ex parte Lackey, Okl.Cr., 279 P.2d 380, order a prisoner into a state hospital for observation for a period of not to exceed ninety days.

We conclude that there was no intention on the part of the Legislature that the provisional procedures provided in Tit. 43A should apply to persons involved in criminal cases, and that there was no intention to interfere with the enforcement of the

criminal laws, but only to supplement and aid in such enforcement.

Ordinarily, whether the court orders a prisoner sent to a state hospital for observation under the provisions of Tit. 43A O.S.A. § 60, or by fact of a judgment as entered in this case on hearing as to defendant's sanity on December 9, 1953, under provision of 22 O.S.1951 § 1162, the court as a matter of practice should make a minute covering the report received from the hospital where the accused was observed, and file such report with the papers in the case, and efficient administration suggests this, but by reason of the facts recited in this case, which were sufficient to overcome any presumption of present insanity of the defendant, the failure of the court to follow such procedure does not constitute reversible error.

It is next contended that "Commitment and confinement of defendant in the Eastern State Hospital under facts and circumstances of record amounted to abuse of legal process and an unconscionable delay of the trial."

We have already pointed out that the only reason, so far as we can discover from the record, that defendant was not promptly tried when his case came on for trial on December 15, 1953 was that in the motion that he filed demanding prompt trial, by the language he used he caused a doubt to arise in the mind of the court as to the sanity of the defendant. It is true that the accused had just recently been returned from the Eastern State Hospital, Vinita, and the record shows that at that time the Superintendent of that Institution concluded that defendant was sane. But if the court had proceeded with the trial after the question of sanity had been raised prior to trial, such error would have probably caused a reversal of the case. See Berwick v. State, 94 Okl.Cr. 5, 229 P.2d 604.

If counsel, after the second commitment of his client to the hospital, had information from the medical staff there that his client was mentally able to aid counsel in preparing his defense, counsel should have filed a motion in the trial court setting out such facts and demanding early trial. This was not done.

The fourth proposition sets out that "The court erred in permitting the State to introduce evidence and to prove a prior and unrelated assault by defendant."

 It is conceded that defendant by going on the witness stand and testifying, ordinarily subjected himself to cross-examination and for the State to attack his credibility as a witness by proof of former convictions through cross-examination or by the record. Storer v. State, 84 Okl.Cr. 176, 180 P.2d 202; James v. State, 64 Okl. Cr. 174, 78 P.2d 708. But it is argued that in a case with facts as this one, such evidence amounted to prejudicial error. No authority in point is cited, and the argument is rejected.

 In proposition five, defendant asserts that "The court erred in submitting the case to the jury on the issue of assault with intent to kill by means of a deadly weapon, and in not submitting same upon every included degree of assault which the evidence in any reasonable view of it suggests"; and in proposition six in connection therewith says that the verdict of the jury was insufficient. These propositions will be discussed together.

We have already seen that the information was based on the third provision of the statute (and not the second as defendant's proposition would indicate) by which the crime might be committed as enumerated in 21 O.S.1951 § 652. (Prior to the 1955 amendment the punishment on conviction was by imprisonment in the penitentiary not exceeding ten years.) The punishment now may be fixed up to include twenty years.

The court being of the opinion that there was no evidence in the record by either the State or defense that entitled the defendant to an instruction on but one included offense instructed the jury on assault with a dangerous weapon, based on 21 O.S.1951 § 645, which, in part reads:

"Every person who, with intent to do bodily harm, and without justifiable or excusable cause commits any assault upon the person of another with any sharp or dangerous weapon * * * with intent to injure any person, although without intent to kill such person or to commit any felony, is punishable by imprisonment in the penitentiary not exceeding five years, or by imprisonment in a county jail not exceeding one year."

Instruction No. 4 complained of reads:

"You are instructed that the statute under which this charge was filed reads as follows:

"Every person who intentionally and wrongfully, with intent to kill any person, commits any assault and battery upon another by means of any deadly weapon, or by such other means or force as is likely to produce death, is punishable by imprisonment in the penitentiary not exceeding ten years.

"In this connection, you are instructed that a deadly or dangerous weapon is one likely to produce death or great bodily injury by the use made of it.

"The question of whether the claw hammer alleged to have been used by the defendant upon the person of one Mary Francis Davis was or was not a dangerous weapon is one to be determined by you from all the facts, circumstances and evidence in this case.

"In determining this question, you may, if you find that said weapon was used by the defendant, take into consideration the nature and character of the weapon so used and the manner and method employed in such use."

It will be noted that this instruction is in accordance with the language of the statute.

Instruction No. 6 reads:

"You are instructed that the information in this case, while it charges assault with intent to kill, includes a lesser offense, to-wit: Assault with a dangerous weapon.

"In this connection, you are instructed that every person who, with intent to do bodily harm, and without justifiable or excusable cause commits any assault upon the person of another with any sharp, or dangerous weapon * * *, with intent to injure any person, although without intent to kill such person or to commit any felony, is punishable by imprisonment in the penitentiary not exceeding five years, or by imprisonment in a county jail not exceeding one year."

The defendant did not testify that he did not intend to kill his wife, he merely denied remembering any facts of the crime charged. His plea was temporary insanity. But the court gave the jury the opportunity to convict defendant of a lesser crime, an included offense, by the giving of Instruction No. 6, which we have just quoted.

We have not, as indicated, quoted the foregoing instructions as models to be followed, but merely to test the objections interposed, and to determine whether the giving of such instructions could have prejudiced defendant's rights and require a reversal of this case.

We said in Dyer v. State, 58 Okl.Cr. 345, 53 P.2d 700, instructions in all cases should be applicable to the facts and to all proper deductions and interpretations of them, and not to questions not presented or covered by the evidence.

Keeping in mind the charging part of the information heretofore quoted in proposition One, we have said that defendant was charged under the third provision in the statute setting out the means by which the crime defined might be committed, to wit: "By assault and battery by means other than a deadly weapon, but by such force as is likely to produce death." As pointed out, the information then detailed the means used. The court did not in his instructions treat the claw hammer as a deadly weapon per se, but the use made of

it, and detailed, was described as likely to produce death and was used for such purpose.

Of course, it could be that the accused did not intend to kill his wife, but only to do bodily harm, so that the court, as stated, gave Instruction No. 6 covering the lesser offense covered by 21 O.S.1951 § 645.

We find no conflict in the instructions given. The verdict returned demonstrates no confusion in the minds of the jury, or that they were misled, as seems to be the theory of the defense.

The verdict returned reads:

"We, the jury, drawn, impaneled and sworn in the above entitled cause, do upon our oaths find the defendant Guilty of Assault with Intent to kill, as charged in the information herein and assess his punishment at ten years."

 As pointed out by counsel for the State, when the verdict of the jury was received and read, counsel for the defendant made no objections to it, but after the jurors had replied in the affirmative to a question of the court as to whether or not it was their verdict, defendant's counsel merely stated, "May we have an exception, your Honor." The court was not advised as to the grounds of objection and given an opportunity to consider such reasons supporting the objection, if any, so that if objection deemed valid, correction could be made. The jury was polled as to the verdict and each answered in the affirmative. Under such circumstances every intendment and inference will be indulged to uphold it, and, if the meaning and the intention of the jury are evident, it will be upheld, and, if necessary, the record will be referred to to ascertain its meaning. Horton v. State, 44 Okl.Cr. 318, 280 P. 857; Gidens v. State, 31 Okl.Cr. 137, 236 P. 912.

As has been noted, defendant was assessed a penalty of ten years confinement in the State penitentiary, the maxi-

mum at the time of the commission of the crime charged, and which the evidence adduced thoroughly justified. We believe, however, in the spirit of fairness, in view of the long time defendant was held in the Eastern Oklahoma State Hospital prior to trial, in the absence of a complete record of the case showing the necessity of the long confinement, that the sentence of ten years' imprisonment should be reduced to eight years' confinement in the State penitentiary, and as so modified, the judgment is affirmed.

JONES, P. J., and BRETT, J., concur.