Robert Joe MORRIS, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12855.

Court of Criminal Appeals of Oklahoma.

Oct. 26, 1960.

Rinehart, Rinehart & Rinehart, El Reno, M. W. Cooper, John M. Lawrence, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

Plaintiff in error, Robert Joe Morris, hereinafter referred to as petitioner, is presently incarcerated in the State Penitentiary at McAlester. This by reason of his having on September 8, 1958, when represented by counsel of his choice, entered his plea of guilty to two charges of robbery with firearms pending against him in Oklahoma County, being cases Nos. 25151 and 25152, and in each of which cases he was assessed punishment at confinement in · the State Penitentiary for twenty years, the sentences to run concurrently. He was delivered to the Penitentiary on September 9, 1958.

On July 10, 1959 there was filed in the district court of Oklahoma County by new counsel in the two cases stated, consolidated, an application for writ of error coram nobis.

 It was not necessary to obtain permission from this Court as the cases in question were not appealed here. In Hendricks v. State, Okl.Cr., 297 P.2d 576, that case had been appealed to this Court and petition for the writ was filed direct here. We treated the matter as if application for permission to file in the trial court was attached, and denied permission as the petition was held not to state facts, which if proven, entitled the petitioner to the writ.

In Hurt v. State, Okl.Cr., 312 P.2d 169, the petition stated a cause, but on hearing

in the trial court the evidence did not support the petition.

■ The trial court where conviction took place and where the records may be found and where record may be made of the testimony, and where officials familiar with the case can be expected to be, is the proper place for the determination of the facts, with right to appeal.

In the petition it is alleged:

"1.

"That on the 8 day of September, 1958, this court entered a judgment and sentence on two separate counts of armed robbery against this defendant; that the defendant appeared before this court, waived a jury, time within which to plead, and entered a plea of guilty to the charges as set forth in the information.

"2.

"That at the time this defendant entered his plea of guilty to these charges, he was an incompetent person and was so adjudged by the County Court of Oklahoma County, State of Oklahoma on the 18 day of January, 1958, and that at such time he was committed to the State Institution for the Insane at Norman, Oklahoma, under an emergency order; that a hearing was duly had, doctors were present, and this defendant was diagnosed as suffering from manic-depressive manner of such violent nature as to require his confinement during mental examination, and prior to the hearing on his committment.

"3.

"That said defendant has never regained his sanity or been judicially restored to capacity, and in fact has been since the time of said committment, to and including the date of the judgment and sentence in this case, an insane person incapable of commission of crime as defined in Title 21, Sec. 152 O.S.A.1951, and further was incapable of preparing or assisting in the preparation and defense of the crimes for which a judgment and sentence have been entered herein.

"4.

"That at the time this judgment and sentence were entered, he had no realization, or presence of mind of the fact that he was pleading guilty to the charges of armed robbery; that his attorney of record at that time had no knowledge or record that this defendant was an insane and incompetent person and had been so adjudged.

"5.

"That at the time this judgment and sentence was entered, the fact of this defendant's incompetency and insanity were not made known to this court and if said fact had been made known to this court, judgment and sentence would not have been passed upon him. That this error which has been committed is not the fault of this court as the court was not advised of this defendant's insanity or incompetency. That had the court been advised of this defendant's incompetency this error would not have been committed and the court, if it had been so advised, could have relied upon the statutory provisions of Title 12, Sec. 385, Subdiv. 1:

" 'Persons Incompetent To Testify.

" 'Persons of unsound mind at the time of production for examination.'

"6.

"That this defendant was a witness against himself at the time he pled guilty and the judgment and sentence was pronounced by this court; that he was an incompetent person incapable of testifying against himself and had no knowledge or realization of the consequence of his actions.

"That there is no statutory remedy at law available to this defendant for correction of errors of fact occurring at his trial.

"Wherefore, defendant prays that this court issue an order setting this

cause for hearing on a day certain, and that upon a hearing thereof this court grant a Writ of Error Coram Nobis for the correction of errors of fact unknown to this court and defendant's attorney at the time of the trial of the above cause, and that the judgment and sentence entered herein in Cause No. 25151 & 25152, entitled State of Oklahoma v. Robert Lee Morris, be set aside and held for naught."

Thereafter there was filed an amendment to the petition in which it is alleged: "that this defendant at the time he entered his plea of guilty to the above numbered charges was an incompetent and insane person and as such was not guilty of these charges by reason of his incompetency and insanity."

■■■ Following this, and on August 17, 1959, the case came on for hearing before District Judge W. R. Wallace, Jr. Demurrer to the petition was not filed, and probably trial courts would overrule demurrers where any doubt existed as to the sufficiency of the petition in this little-used field and give the appellate court opportunity to examine the evidence in support of the petition. Only error of fact in trial where it is sought to set aside a resulting judgment, may be considered.

Petitioner offered in evidence exhibit 1, concerning the mental health of petitioner, and on January 15, 1958 finding him mentally ill and in need of treatment. The report shows that he used liquor and narcotics at times.

Exhibit 2 offered in evidence was a certificate from County Judge William A. Berry of Oklahoma County dated January 16, 1958 ordering that petitioner be admitted to the Central State Griffin Memorial Hospital at Norman. Exhibit 3 was a letter from Ted R. Thompson, Medical Administrative officer of the Hospital directed to the County Judge, Oklahoma County, advising that Robert Joe Morris was discharged from the Hospital on April 8, 1958, to the care of his mother, Mrs. Clara Landers, 5516 South Barnes, Oklahoma City.

There was offered in evidence exhibit 4, being a letter from Moorman P. Prosser, M. D., to Mr. Dean Rinehart, attorney at law, El Reno, and dated November 13, 1958 in which he relates that in January, 1958 he examined petitioner and found him to be suffering a severely unstable personality with schizophrenic features coupled with narcotic addiction. Petitioner was re-examined November 7, 1958. The doctor recommended long-term treatment. The court ruled that this letter was improper and could not be considered.

M. W. Cooper testified for petitioner. He said that he was the attorney of record who represented petitioner on September 8, 1958 when he entered his pleas of guilty, now complained about. He said that the informations in cases 25,151 and 25,152 were read to Robert Joe Morris. He said that Mr. Lawrence, shown to have been Mr. Cooper's partner, appeared in court in the morning and waived further time to plead, etc., but that witness was present. He said he had never heard, as he could recall, that petitioner had ever been confined to the mental hospital at Norman, or to a hospital in California. He said he had never heard of his client being mentally ill, or that he was addicted to the use of narcotics. He modified the answer as to narcotics to the statement, "No, I don't actually know."

On cross-examination, witness stated that he had represented petitioner quite a number of times, but the exact number of times he did not recall. He said that he had known petitioner 20 to 25 years, knew him when he was in school, knew his mother and father, and had a conversation with the mother in September, 1958 regarding the charges that were pending against the petitioner. He admitted that he discussed with petitioner's mother the possible defenses in the case. He did not recall the mother mentioning or saying anything about her son's mental condition.

Witness said that previous to his client pleading guilty to the two armed robbery charges he discussed the case with him a

number of times, one time for about two hours; and that he conferred with the assistant county attorney, Mr. Theus, several times.

The record shows that in case No. 25,151 petitioner was charged with, on July 11, 1958, making an assault upon Charles R. Smart and Glen Teets at Connie's Prescription Shop, located at 2507 N. W. 23rd Street, Oklahoma City, with a .45 blue-steel revolver and taking from them $38.27 in money and a large quantity of narcotics, itemized. In case No. 25,152 he was charged with at gunpoint on June 23, 1958 robbing certain clerks at the Indiana Drug Store in Oklahoma City of $135 in cash and an undetermined amount of narcotics. On August 1, 1958 he was arraigned and entered a plea of guilty in each case.

On August 28, 1958 case No. 25,151 was set down for trial for September 8, 1958, but on that day petitioner here changed his plea to guilty in both cases, Nos. 25,151 and 25,152, and the county attorney recommended in each case that petitioner be confined for 20 years, the sentences to run concurrently.

Concerning the question of petitioner avoiding trial in the two armed robbery cases, and entering pleas of guilty, Mr. Cooper said: "Well, after discussing it, he wanted to think it over. He would let me know Monday morning when he appeared in court on arraignment." He said that on Monday morning petitioner advised Mr. Lawrence, shown to be Cooper's partner, that he wanted to plead guilty. Mr. Cooper was present.

This ended the evidence for petitioner. Petitioner had been brought over from the penitentiary at McAlester, and was present and available for consultation with his attorneys and relatives.

The State produced Mr. Harold C. Theus, assistant county attorney, who testified. He said that he handled cases Nos. 25,151 and 25,152, State v. Robert Joe Morris, and that about a week before petitioner herein changed his plea from not guilty to guilty, he talked with him in the county attorney's office. He thought he talked with him twice. Witness further testified as follows:

"Q. Would you relate, as near as you can, the conversation that you had with the defendant—the petitioner—briefly—previous to the date he plead guilty? A. Yes. We were getting ready. It was already set up for the September, 1958 trial docket. And he had been arraigned some time earlier in the month of August, as I remember it. In the district court. And two cases of armed robbery were pending here. One was, he was charged with robbing Connie's Prescription Shop, which is supposed to have happened some time in July, 1958; and, the other one—he was charged jointly, I believe, with another fellow—Anyway, there was another fellow brought into it, I believe, and charged with robbing the Indiana Drug, at 10th and Indiana, which is alleged to have happened in the month of June—before this Connie's Prescription Shop robbery. There was a great deal of investigation going on, principally in Canadian county by John Whalen, county attorney over there, in the death of a girl—Kay Buchannan—with whom this defendant—this petitioner—had been associated.

"My conversation with him—the petitioner—one was surrounding the death of this Kay Buchannan girl; and the other, of course, to get acquainted with the defendant—and to see what they wanted to do about these cases.

"The petitioner had previously given written statements, I believe, on three different occasions, to the officers here, concerning the Connie Prescription Shop robbery.

"He recounted the whole story in detail concerning the Connie Prescription Shop robbery; but I did not talk to him in such detail about the Indiana Drug robbery.

"But he told me, that on this July 10th—or whatever the date was—that

he and this Kay Buchannan that he described as a girl friend—he was more or less in love with her—or expressed a feeling of affection for her—she was a prostitute and narcotic addict—that he was living with her—and I believe that he used the words, 'shacked up with her'—and that she suggested robbing Connie's Prescription Shop, just a day or two before the robbery, and he went with her and she drove the car and parked by a filling station and he told me what station, but I do not recall it, and that she remained in the car, and he went out to the prescription shop, with a pistol, and robbed them of narcotics and I believe money. I remember, 'narcotics'. I believe he said he had the people lie down on the floor. He stepped over the counter himself. There are some details I do not remember.

"I remember that he had one of the men there put the narcotics in a box. He was after the hard stuff. Opium derivitives.

"Another thing he told me—he said he did not think he was hooked himself. That he had too much time in prison to stay here. But that he did use it.

"He told me about the robbery in detail and about his participation in detail and he said, 'I got in the car and went to a hotel down in the south part of town'—I believe he said, where they were living and stayed there a while. Went to ElReno by way of Chickasha and there in a motel on the highway—the Rancho Motel—something like that—and while there some people by the name of Ball came over—a girl and a fellow with them, came over. And they were there for a while. I remember he told me that the narcotics, out of the Connie's Prescription Shop, had been wired underneath his car. And at this motel in ElReno he and Kay Buchannan—I remember he called it—were shooting the narcotics. That Kay took an overdose—he had a term for

that too—but I do not recall just what it was. That he, at one time, himself took an overdose. He told me about the Ball boys walking him up and down the road to get him on his feet.

"He told me about finding Kay Buchannan in bed there with an overdose and I believe they gave her artificial respiration, and someone else helped him. Some of the other people.

"And I remember that he told me that Kay Buchannan—that he woke her up to help him find the vein and she helped him find the vein and shoot himself and they were all pretty well sedated with this stuff.

"And they had told Kay not to take any more and after she had helped him find the vein in his arm he told her to go ahead and use what she wanted to and he went to sleep and woke next morning and tried to arouse her to help find the vein in his arm to take another jolt; and, I believe, at that time he found that she had expired. I am not right sure whether that is the time he found she had expired or whether he found her short of breath and gave artificial respiration to her. Anyway, she expired.

"And they took her out and buried her and later on, he took the officers out there and had gone out with them and they dug her up.

"I talked with him at quite some length after that just about narcotics and things in general. I remember it was like talking to a medical doctor—a brilliant man. He could talk medicine and narcotics and particularly narcotics and psychiarty. You would be surprised at his understanding and grasp of those things. I do not know how he got himself in all this mess or talked himself into it, but he had a great grasp of any subject I talked to him about.

"Q. Would you relate whether or not he had ever been treated for narcotics? A. Yes, and again I cannot state specifically as to what he said

other than he had psychologists or psychiatrists attempt to—I do not remember the conversation—but I think I understood he had been out somewhere possibly for treatment.

"Q. In your conversation with him and observing his demeanor and manner and conversations would you have an opinion as to whether or not he was rational or irrational?

"By Mr. Rinehart: If the court please, we object to that. As to a medical opinion. This man is not properly qualified.

"By the Court: He asked him if he had an opinion as to whether he was rational or irrational.

"By Mr. Rinehart: He would not be qualified as an expert in medicine.

"By the Court: It will be sustained.

"Q. Did you have any conversation with the defendant in this case as to what plea the county attorney would accept if he plead guilty? On the two charges of armed robbery? A. Yes, I believe I did. Now, most of the specific conversation concerning that was with his attorney. However, some of this was discussed with him on that occasion. And I believe that I told him that I was going to recommend 25 years.

"Q. What did he say to that? If anything? A. Well, he wanted to do a little better than that. Wondered if I could do a little better than that.

"Q. Did he give you why he wanted —A. Well, he had it pretty well figured out. How much time it would take him to do it, and he wanted to get out by the time he was a certain age. I have forgotten what that was. Forty-eight years old, I believe. Naturally, he wanted to do as little time as possible.

"Q. What did you tell him, and what did you agree upon. A. I don't believe I—

"Q. If anything? A. —left any definite answer with him of any lesser

time, and again, it has been quite a while and I cannot state any time I agreed with him or his attorney both. At that time it was with his attorney, I remember. I told him I would recommend 20 years and that is what we finally gave him.

"Q. Did you have any conversation with the petitioner that he had a right to go before a jury; or whether or not he wanted to do that? A. Yes, sir. I told him I didn't have any idea of getting him to plead to anything. That I didn't care whether he did or not. That he could plead or not plead. That he had a right to a trial and I would be glad to give him one. Two, as a matter of fact. I just had him there to talk about the thing and see if we could clear up the matter of Kay Buchannan's death over at ElReno.

"Q. Did he indicate or not whether he wanted a jury trial? A. No, he didn't want a jury trial. He said that he had told the officers what he had done. In fact the evidence was against him and he didn't see any point in facing a trial.

"Q. Did you later talk to defendant's counsel? Do you recall who the defendant's counsel was? A. Yes, in fact I talked with two different ones. They are associated, or were at the time, in the practice of law. John H. Lawrence and M. W. Cooper.

"Q. Do you recall how many times you talked with counsel for the defendant? A. Oh, I couldn't be exact. I think I could say somewhere from 2, 3, 4 or 5 times perhaps. There were several occasions when we did not go into detail—but we had at least 2 or 3—3 I would say—serious conferences.

"Q. Do you recall the substance of conversations you had with counsel? A. Not in detail. Other than they did not see any point in going to trial. They didn't want to go to trial. They wanted to do the best they could for the

defendant without a trial. I believe, in our conversations, that this defendant was a kinsman of one of them. I believe he was a nephew of M. W. Cooper.

"Q. Did they indicate to you that they had talked to the defendant? Or anything about they wanted you to recommend a—A. Yes. They were definitely feeling that was to the best interest of their client all the time. And they told me they had thought it over and talked it over and, in their opinion, the best thing to do was for him to enter his plea of guilty, and if he agreed with them, that is what they would do. I finally agreed on that figure—20 years—and they said, 'Well, that's a lot of time. That's pretty stiff.' and I said, 'Yes, sir, and it takes a lot of guts to stand up in front of the court and take that amount of time and I'm not telling you to take it and I do not care whether you do or not. I had just as soon have him go to trial, because if there was ever a case made where an individual was entitled to be tried this was the case.' He had quite a sorry record and with a record like that he was reluctant to go to trial and counsel was reluctant to let him go to trial.

"Q. No further questions. You may inquire.

"Cross-Examination

"By Mr. Rinehart: Q. Mr. Theus, I want to call your attention to petitioner's exhibits. Defendant's exhibits 1, 2 and 3. And ask you if you had ever seen them before the filing of this writ? A. No, I had not seen them before that. However, this is the commitment—

"Q. Yes, that is correct. It is my understanding then that you knew nothing about it at the time of this commitment at Norman, Oklahoma, January 18, 1958? A. No, and I didn't suspect anything wrong with it—

"Q. That wasn't the question I asked you. You knew nothing about it and they never told you about it? A. No.

"Q. During the conversations you had with the defendant here, when the cases were pending, was that in the presence of Major Cooper, as counsel? A. I am not certain that it was. I am not able to say whether it was or not. My present impression is that maybe Major was not there.

"Q. During these discussions about this woman's death—is that when you talked to him about taking pleas? Is that my understanding of your testimony? A. Well, the death of this woman—there was a continuation of that for a day or two—and the narcotics they got in this Connie's robbery, and his statements—that was before the major consideration, concerning his plea, which were with his counsel. I do think there was some discussion of it, however, with the defendant while he was there.

"Q. About how long did you talk to this defendant, oh, over a period of a week, or two weeks, or whenever you discussed it? And how long? A. I do not recall specifically how many times I talked to him. One time, that I recall specifically, I would say an hour or more, about which I have previously testified.

"Q. About how long—over the period of time you were concerned in the case, did you talk to him, with his counsel or by himself? Just between you and he? A. Oh, as I recall, we had that one conversation and I cannot testify, of my knowledge, whether I talked to him any more until the day of his plea.

"Q. Well—would you say 2 hours or 3 hours over the period of time he was confined here? A. Not over that time.

"Q. And during the time of these discussions you had with him, he, at no

time, mentioned about being confined at Norman. Is that correct? A. Not that I recall. I am sure that he did not.

"Q. That is all. A. I will say that I did know—I had no other way to get it other than from him—I believe he told me that he had had some psychiatric therapy.

"Q. As to the particulars—did he ever discuss that with you? A. No.

"Q. Thank you. That is all."

The State next offered as a witness Dr. Harold W. Hackler, psychiatrist at the Central State Hospital, Norman, and chief of physical therapy who handled petitioner's case when he was a patient at such hospital. The State offered to prove by Dr. Hackler that the petitioner was not incompetent and was discharged from his institution non-psychiatric. This was objected to by counsel for petitioner by reason that petitioner had been judicially determined incompetent in the county court of Oklahoma County on January 8, 1958 and sent to Central State Hospital as dangerous to himself and other people. The court sustained the objection and did not permit the witness to testify further.

If the matters alleged had come to the attention of the trial court, he would not have by such concluded that the petitioner could not be tried, but would have empanelled a jury to determine his competency to aid counsel in his defense, and Dr. Hackler would have been a competent witness to testify. See Davis v. State, Okl. Cr., 300 P.2d 1000. But here the error was in favor of the petitioner.

The State next offered a stipulation that E. A. Capshaw, deputy sheriff, if present, would testify that petitioner's mother came to him and wanted him to help the petitioner to be committed to the Central State Memorial Hospital; that he talked to the petitioner regarding his commitment for the purpose of taking a hand in helping him to quit the use of narcotics. Counsel for petitioner objected to such stipulation as incompetent, irrelevant and immaterial

and the court sustained the objection. This ended the testimony.

The court continued the case until August 7, 1959 and granted petitioner five days to file brief, and the State five days to file answer brief. The case was on August 7 passed to August 17, and on that day the writ of error coram nobis was denied. Then followed perfection of appeal to this Court. Petitioner was returned to the State Penitentiary.

■ The judgment of the trial court must be affirmed. The evidence here shows that petitioner was represented in cases Nos. 25,151 and 25,152 by two attorneys of his own choosing; that he took time to deliberate before deciding to plead guilty. His cases had been set for trial before juries where convictions would not necessarily run concurrently. He also was being investigated for manslaughter. One of his attorneys was related to him, and had known him since schooldays, and had represented him in a number of other cases. He conferred, not only with the petitioner but with petitioner's mother, who had caused petitioner to be sent to Central State Griffin Memorial Hospital in the first instance, and in whose care he had been discharged. Petitioner was a dope addict. If there was actually any question as to the mental derangement of petitioner, it could have, by the use of just ordinary diligence, been discovered by petitioner's counsel. The mother knew and apparently kept quiet.

The assistant county attorney considered petitioner a brilliant person. In a long conversation with petitioner, the assistant county attorney did learn that petitioner had in the past received some psychiatric therapy, but such made no impression on witness due, apparently, to the efficient manner in which he had been co-operating with his two attorneys in getting a recommendation for concurrent sentences of twenty years in the two cases where within hours he was scheduled to stand trial before juries. And where the penalty in each case might have been death. 21 O.S.

1951 § 801. Apparently neither the trial counsel nor trial court had any doubt as to petitioner's sanity.

We quoted with approval in State ex rel. Burford v. Sullivan, 86 Okl.Cr. 364, 193 P. 2d 594, 602, and in Hendricks v. State, Okl. Cr., 297 P.2d 576, the statements by Justice Elliott in the basic case of Sanders v. State, 85 Ind. 318, 44 Am.Rep. 29, where there the writ was granted, but where the court in decision said:

"It is our opinion that the courts have the power to issue writs in the nature of the writ coram nobis, but that the writ can not be so comprehensive as at common law, for remedies are given by our statute which did not exist at common law—the motion for a new trial and the right of appeal —and these very materially abridge the office and functions of the old writ. These afford an accused ample opportunity to present for review questions of fact, arising upon or prior to the trial, as well as questions of law; while at common law the writ of error allowed him to present to the appellate court only questions of law. Under our system all matters of fact reviewable by appeal, or upon motion, must be presented by motion for a new trial, and can not be made the grounds of an application for the writ coram nobis. *Within this rule must fall the defense of insanity as well as all other defenses existing at the time of commission of the crime.* Within this rule, too, must fall all cases of accident and surprise, of verdicts against evidence, of newly discovered evidence, and all like matters." (Emphasis supplied.)

If petitioner had not been represented by counsel, we would have a more difficult problem. But petitioner was the nephew, according to the evidence, of one of his attorneys and he had known petitioner intimately over a long period of years. If he had entertained any doubt as to petitioner's mental condition, he would have made such known to the court and interposed it as a defense. By the use of any diligence he would have discovered petitioner's recent confinement in the State Hospital. The evidence refutes any idea that petitioner was not mentally competent to make a rational defense. Marshall v. Territory, 2 Okl.Cr. 136, 145, 101 P. 139, 142; 22 O.S. 1951 § 1162. But as stated, if counsel had had any doubt, a jury would have been empanelled to settle the issue. It is too late, coupled with the evidence developed, to now seek the setting aside of the judgment complained of. See Mitts v. State, Okl.Cr., 345 P.2d 913, where this Court held that question of accused's sanity at time he committed homicide or his sanity at time of trial could not be raised for the first time after rendition of verdict.

The judgment of the trial court denying the writ of error coram nobis is affirmed.

NIX and BRETT, JJ., concur.